**In re VERMONT KNITTING COMPANY, INC., Debtor.**

**Bankruptcy No. 87–274.**

United States Bankruptcy Court, D. Vermont.

Issued Jan. 17, 1989.

Amended March 29, 1989.

Decided March 30, 1989.

R. Broderick, Tepper and Dardeck, Ludlow, Vt., for movant, Universal Knitting Corp. (Universal).

G. Gebauer, Saxer, Anderson, Wolinsky and Sunshine, Burlington, Vt., for trustee, D. Wolinsky (trustee).

K. Scarborough, Montpelier, Vt., for U.S. Small Business Admin. (SBA).

## MEMORANDUM DECISION ON MOTION FOR RELIEF FROM STAY TO PURSUE REPLEVIN ACTION

FRANCIS G. CONRAD, Bankruptcy Judge.

Universal moves under 11 U.S.C. § 362(d) for relief to pursue a State Court replevin action against computerized knitting machines in the possession of the trustee. The trustee objects, and asserts Universal was unperfected. We deny the motion because we find Universal is unperfected and unsecured, and therefore, is not entitled to relief from the automatic stay.

On July 3, 1983, the debtor (Knitting), by its president, N. Davis (Davis), signed a sales order (Movant's 3) to purchase two (2) new Universal flat knitting machines: Model(s) MC–611, 7 cut, 213 cm., transfer jacquard with electronic needle selection on both beds. Universal signed the sales order on July 14, 1988 (sic). Testimony from a Universal witness clarified the actual year was rather 1986. The machines were delivered to Knitting on July 19, 1986 by a shipper named Castiglione. On that date, Davis, on behalf of Knitting, signed financing documents, not introduced into evidence, and returned them to Universal with the shipper. Universal's witness testified it signed the financing documents on July 21, 1986 at their Brooklyn, New York office. The parties stipulated that the financing documents were proper in all respects and that the Uniform Commercial Code financing statement was recorded in Vermont.

On July 25, 1986, a Universal technician named Herb performed set-up work and put into production machine No. 67317 (Movant's 1). He also re-needled and made a design for machine No. 67319. This machine was also put into production (Movant's 2). Movant's 1 and 2 were entitled "Service Report," and both Herb and Davis acknowledged the set-up work was performed. At this juncture, the parties divide on their view of the facts.

Universal produced a witness, Mr. Stooea, a long-term employee and officer of Universal. He testified with credibility and conviction that the arrangement between Universal and Knitting was not complete until the machines were set-up by technician Herb. He described how the machines, when they arrived from Germany, were uncrated in Brooklyn, New York. The machines, with their separate computers and attachments, were then sent to Knitting. Mr. Stooea explained that he did not believe the machines could be operational until technician Herb performed the set-up work. He noted that originally Universal intended to wait a week after the machines were delivered before sending the technician to Knitting. Universal anticipated placing technician Herb at Knitting on a Friday so he could spend the weekend in Vermont.[1] Mr. Stooea testified that Davis, however, telephoned Universal shortly after delivery of the machines and requested a technician be sent immediately because "he (Davis) wanted the machines to produce, and he (Davis) did not want to wait."

Davis and his spouse have a different view of when the machines became operational. The machines arrived at Knitting on July 19, 1986, a few days earlier than they had expected. Davis testified he paid

---

1. This method of scheduling work so employees enjoy a weekend in our beautiful State is a long recognized custom.

shipper Castiglione $100.00 to move some Dubied knitting machines out of the way to make room for the two new Universals. He explained that shipper Castiglione brought the two Universals inside his manufacturing plant. The machines arrived needled, but not to any specific pattern. Davis told us that once electricity and the computers were hooked up, the machines were operational. He explained that he personally ran a 220 (volt) line to the machines the day they were delivered. Davis hedged and equivocated about whether the computers accompanying the knitting machines were hooked-up at that time, but eventually acknowledged he did not remember attaching them. He assumed technician Herb must have attached them on July 25, 1986. Davis explained that he was not concerned about the immediate set-up of the machines because Knitting had no pressing orders to run on them.

Davis and his spouse were unequivocal in their testimony about their ability to set-up the machines without Universal's technician.

Mrs. Davis testified that she spent more than six months in Germany attending training programs on knitting machines. Her training taught her how to set-up, operate, and program the machines. She explained that she received extensive training on the Dubied knitting machines at an earlier time and then additional training specifically on the Universal machines. She told us the Dubied and the Universal knitting machines have very similar operating configurations. The two new Universals were also identical in hook-up procedures to two of the three machines Knitting already owned. The computers to these machines were interchangeable and that she had in fact previously swapped computers between their other machines without the aid of a technician.

Mrs. Davis asserted with certainty that her training in Germany showed her how to set-up the machines, and that in her view, although the machines were not operational on July 19, 1986, they could have been if Knitting had needed to use them immediately. In Knitting's view, possession took place on July 19, 1986 when the machines were delivered.

Universal's witness testified that as a matter of policy the company's technician was sent to do the set-up on new machines because Universal wanted to ensure their product was set-up properly. He disputed Mrs. Davis's testimony that she was taught to set-up the machines while in Germany. In Universal's view, possession took place on July 25, 1986 when the machines became operational.

Based upon the facts, the issue at hand is quite focused: when did Knitting take possession of the Universal knitting machines; and, did perfection occur within 10 days after possession?

Universal claims Knitting did not have possession of the machines until the set-up was completed by their technician on July 25, 1986. If their view is correct, their UCC–1 statement filing in Vermont, on August 1, 1986 was filed timely under Article 9 of the Uniform Commercial Code. If the date of possession, however, is July 19, 1988, the date of delivery of the machines to Knitting, the ten (10) day grace period for filing purchase money security interests in goods was missed, and Universal loses its priority as a secured creditor.[2]

**2.** In its motion for relief, Universal made the alternative argument that in the event we find July 21, 1986 is the date of possession, the date Universal signed the security documents, Fed.R. Civ.P. 6 provides an extension of the time to file UCC–1's. Universal was relying on the wording in Rule 6 which refers to "other applicable statutes" and the extension of time to perform, if the time to do some act is less than eleven (11) days. Before testimony began we ruled this argument was without merit. We held that the transaction was a State law transaction in 1986, and thus, the Federal Rules of Civil Procedure could not possibly be applicable to this transaction. Furthermore, the UCC treatise written by Summers and White on the Uniform Commercial Code indicates that Federal law would rarely preempt Article 9. On the record, we gave two examples of statutes which in our experience could possibly preempt Article 9. We referred specifically to the Federal Maritime Act, 46 U.S.C. App. § 1601, *et seq.,* and the Federal Aviation Act, 49 U.S.C.App. § 1301, *et seq.*

We also held that the scope of Court Procedure Rules embraced Courts and not statutes. We relied on the decision in *Joint Council of*

Before we begin our discussion of the law, we need to recite more of the evidence presented to us. We solicited this evidence when we attempted to clarify testimony from Universal's employee.

Marked as Movant's 3 is a document entitled: "Sales Order." It is a Universal preprinted form. On the front it contains language about a lease-purchase with a lump sum price or a purchase with outside financing.

Material to Universal's position about when possession took place is the typed language in the sales order which recites that in addition to the down payment, money was "payable at $2,000.00 per month (on Security Agreement) starting 60 days after set up of machines." (parentheticals in sales order). Universal believes that possession did not take place until their technician's set-up, and therefore, the ten (10) period to file the UCC–1 did not start to run until July 25, 1986.

But Movant's 3 also contains the preprinted language "See Reverse Side for Terms and Conditions." On the reverse side, the language is also preprinted and refers to "Installation," "Interpretation & Construction," and "Security Interest," among other several other provisions.

"Installation" is paragraph 7 of the reverse side terms and conditions and states:

Unless otherwise specified herein, the Seller does not agree to install any of the items covered by this order.

"Interpretation & Construction" is paragraph 15 of the reverse side terms and conditions and, in pertinent part, states:

This writing is intended by the parties as a final and complete expression of their agreement and may be modified only by an agreement in writing signed by both parties. This agreement and its terms is (sic) to be governed and construed in accordance with the laws of the State of New York ...

"Security Interest" is paragraph 3 of the reverse side terms and conditions and states:

Notwithstanding any of the foregoing provisions, Seller expressly reserves and Buyer hereby grants a purchase money security interest in the goods for the amount of the purchase price stated herein. *If payment is to be made after shipment,* Buyer hereby agrees to grant Seller a security interest in the goods and in the proceeds thereof, said security interest to remain in full force and effect until all monies due and owing by Buyer to Seller have been paid in full. Buyer specifically agrees that Seller may file one or more financing statements pursuant to the Uniform Commercial Code and hereby grants to Seller power of attorney to execute and sign such statements in Buyer's name.

Although Knitting is a Vermont corporation, and the machines were delivered in Vermont, New York's Uniform Commercial Code, 1972 version, and its interpretation, is the law applicable to this multiple State transaction. New York's § 9–103(1)(b), *Perfection of Security Interests in Multiple State Transactions,* provides:

Except as otherwise provided in this subsection, perfection and the effect of perfection or non-perfection of a security interest in collateral are governed by law of the jurisdiction where the collateral is when the last event occurs on which is based the assertions that the security interest is perfected or unperfected.

Section 9–103(1)(b) has come to be called the "last event test" section. The section has caused some consternation among its draftpersons. Mr. Coogan, in an article entitled *The New UCC Article 9,* 86 Harv.

*Dining Car Employees v. Delaware O & D,* 157 F.2d 417 (2d Cir.1946), which held that the Rule relating to computing a period of time prescribed or allowed by the Federal Rules is a Rule of procedure relating to acts done or proceedings had after commencement of an action. We indicated also that if any set of Procedural Rules applied, the Vermont Rules of Civil Procedure would apply. Since the Vermont Rules are similar in scope to the Federal Rules the holding in *Dining Car* is applicable. Finally, we pointed out to Universal that Vermont Rule 6 was not amended to encompass events of less than eleven (11) days until 1987, and therefore, the seven (7) day Rule in effect in 1986 took Universal away from any hoped salvation from the Rule.

L.Rev. 477, 539–42 (1978), questioned whether anyone would be able to determine the "last event." Professor Kripke, on the other hand, thought the "last event test" "self-evident." *See*, Kripke, *The "Last Event" Test for perfection of Security Interests Under Article 9 of the Uniform Commercial Code*, 50 N.Y.U.L.Rev. 47, 48–49.

We believe Kripke has the better view. To determine which jurisdiction's law to apply one need only answer the following question: Was the collateral ever in a jurisdiction at or after the time at which the steps necessary to perfect that interest in that jurisdiction have all occurred?

Following this inquiry, it is self-evident that the last event for perfection of Universal's interest took place in Vermont, i.e., the filing of the financing statements. Thus, New York's Uniform Commercial Code, § 9–103(1)(b), directs us to Vermont's Uniform Commercial Code, 9A Vt.Stat.Ann. § 1–101, *et seq.*, to determine the number of days in which a purchase money security interest may be perfected by filing.

Vermont's § 9–312(4) provides:

A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter.

The trustee disputes Universal's security interest on a sole ground—that Universal failed to perfect its security interest within the ten (10) day grace period provided by the statute. The dispute precariously perches on the meaning of the term "possession" in the statute. Universal's evidence shows the machines were set-up and ready to run on July 25, 1986. The trustee's evidence shows that on July 19, 1986 the machines were completely assembled and did not require any installation other than connections to a computer and an electrical source. In the trustee's view

Knitting could have hooked up the machines and made the machines operational at that time. No other material components were needed, nor were any additional components delivered after July 19, 1986.[3] Delivery was complete on July 19, 1986, and on that date the machines were in the possession and control of Knitting.

Possession is not defined in the 1962 version of the Uniform Commercial Code. Possession, a noun, is the act or fact of possessing. To possess, a transitive verb, means to gain or exert influence or control, dominate; to cause to own (or) hold something, such as property. Pg. 9967, *The American Heritage Dictionary*, 2nd College Ed., 1985.

The facts show Knitting had the machines and their computers within its control on July 19, 1986. The machines and their computers were inside the manufacturing plant. If Universal wanted to *repossess* the machines for any reason after July 19, 1986, they would have needed Knitting's permission to do so.

Universal argues that Knitting did not possess the machines until July 25, 1986 when technician Herb came to set-up the machines. Although this argument when first aired seems to have merit, it fails when subjected to further inspection. First, we do not find any contract term which requires a set-up. The reverse side terms and conditions, supra, quite clearly contradict Universal's witness's claim that their set-up service is both company policy as well an essential ingredient to the sales agreement. The sales order which Universal drafted does not support their argument, and since Universal provided the form agreement we must construe it strictly against them.

Second, and again their position is compromised by their own agreement, the reverse side terms and conditions clause "Security Interest" indicates a security interest was to be taken after shipment of the machines if payment was to be made after shipment. Shipment is not defined in the

---

**3.** There was some evidence about the delivery of the knitting needles by Universal and which were installed by technician Herb. Both parties agreed, however, that the needles were a minor ingredient to the issue disputed.

sales order—that is whether it is FOB destination or FOB shipping point. We received no evidence about when the goods left Brooklyn, New York, however, we do know the goods arrived in Vermont on July 19, 1986. Thus, for purposes of this matter, the security interest by the very terms of Universal's sales order must arise on July 19, 1986.

Third, if we were to find possession occurred after technician Herb set-up the machines, Universal would be free to delay and avoid the requirements of Vermont's § 9–312(4) indefinitely. The Uniform Commercial Code Article 9 is a notice statute. Article 9 simplified many of the more rigid and complex formalities of pre-Uniform Commercial Code law and made the information contained in the lien files of recording entities more accessible. If Universal was allowed to suspend the running of the ten (10) day period until it saw fit, it could manipulate that time to the detriment of other creditors and quite possibly avoid Article 9's filing requirements altogether.

The facts show Universal filed outside the ten (10) day provision of § 9–312(4). Its purchase money may not be accorded as a first priority lien. Since it is not in a priority position, it is not entitled to relief from the automatic stay.

The trustee is directed to submit an appropriate Order on notice to Universal.