CITIZENS NATIONAL BANK OF DENTON and the Federal Deposit Insurance Corporation, as Receiver for Citizens National Bank of Denton, Petitioners,

v.

John H. COCKRELL, Jr., Respondent.

No. D–0805.

Supreme Court of Texas.

March 3, 1993.

Rehearing Overruled May 5, 1993.

William L. Smith, Denton, Stuart Johnson, Addison, J. Scott Watson, Washington, DC, Paul C. Wolf, Dallas, for petitioners.

S. Stewart Frazer, Johnette Oden, Dallas, for respondent.

OPINION

PHILLIPS, Chief Justice.

The issue in this case is whether a seller of equipment timely filed financing statements reflecting his purchase money security interest. To decide this question, we must determine when the purchaser received possession of the equipment. We conclude that as a matter of law the purchaser's control over the equipment after sale constituted "possession" within the meaning of TEX.BUS. & COM.CODE § 9.312(d), and we therefore reverse the judgment of the court of appeals for the seller against a competing creditor. 802 S.W.2d 319.

Respondent John H. Cockrell, Jr. owned a mini-blind manufacturing business in Dallas, Texas. On August 1, 1985, he executed a written agreement for the immediate sale, assignment, and transfer of the business and its assets, including merchandise, leases, and fixtures, to Kevin and Richard Sydnor. Cockrell promised to pay all business debts incurred prior to August 1, but he was to be paid all accounts receivable that had accrued as of that date. The Sydnors paid Cockrell $5,000 cash and signed a promissory note in the principal amount of $130,000. To secure payment of the note, the Sydnors agreed to grant Cockrell a security interest in the transferred assets.

The Sydnors began operating the mini-blind business on August 1, assuming the lease on the warehouse where the equipment was located on that date. However, Cockrell also participated in the day-to-day operations and had access to the equipment until early October. Cockrell testified that he was concerned about relinquishing control of the equipment to the Sydnors while there were still orders in process for which he was responsible, as it was only through successful completion of these orders that he could fulfill his contractual obligation to

pay for the debts incurred prior to August 1. For this reason, and to assist the Sydnors in becoming familiar with the manufacturing process, he and two of his employees remained involved with the work in the warehouse, and Cockrell retained a set of keys and continued to use an office three doors away.

During the first few days in October, the Sydnors told Cockrell that, from collecting receivables on Cockrell's behalf, they were able to make the payment due to the business's major supplier for raw material purchases. Cockrell testified, "We had a moment of great joy when they made the first major hurdle. And at that point, then, we were ready to give them possession of the equipment." On October 3, Cockrell turned over to the Sydnors his set of keys to the warehouse. On or about the same day, Cockrell testified, he and the Sydnors executed the security agreement and signed the financing statement. Cockrell filed the financing statement with the Secretary of State on October 7, 1985.

Prior to making this agreement, the Sydnors had become indebted to Provident Bank of Denton on a promissory note in the original amount of $40,000, backed by a security interest in all equipment then owned or thereafter acquired by the Sydnors. Provident Bank had filed a financing statement covering this security interest on May 9, 1985. When the Sydnors acquired rights in the mini-blind equipment by purchasing the business from Cockrell, Provident Bank's security interest attached to the collateral and became perfected. *See* TEX.BUS. & COM.CODE ANN. §§ 9.203(a, b), 9.303(a) (Vernon 1991). The note and security interest were subsequently purchased by Petitioner Citizens National Bank of Denton (the Bank).

After assuming complete control of the mini-blind business on October 3, the Sydnors defaulted in their obligations to the Bank. The Bank foreclosed on the equipment and sold it to a third party.[1] Cockrell then brought this suit against the Bank, claiming that since his security interest had

priority, the Bank's foreclosure and sale amounted to conversion of the property. Although Cockrell concedes that the Bank's security interest attached and became perfected prior to perfection of his security interest on October 7, 1985, he asserts the priority accorded to a purchase money security interest. *See id.* §§ 9.107, 9.312(d). Section 9.312(d) gives a purchase money security interest priority over a conflicting security interest "if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter." The decisive question in this case is whether the perfection of Cockrell's security interest on October 7, 1985, was within 20 days after the Sydnors "received possession" of the equipment.

The case was submitted to a jury, which answered all questions favorably to Cockrell, including this question:

> Do you find that John H. Cockrell, Jr., filed notice of his security interest with the Secretary of State of the State of Texas at the time that the Sydnors received possession of the collateral or within 20 days thereafter?
>
> ANSWER: "Yes" or "No."
>
> Answer: yes

The charge contained no definition of the term "possession," as the trial court sustained an objection to Cockrell's request for an instruction that possession was "the detention and control of the property for one's use and enjoyment either as owner or as the proprietor of a qualified right of property to the exclusion of all other persons."

The trial court granted the Bank's motion for judgment n.o.v., holding that there was no evidence of probative force to sustain the jury's answer to the question quoted above. The court of appeals reversed the trial court's judgment, concluding that "possession" in section 9.312(d) "means that condition of facts under which one can exercise power over property at his pleasure to the exclusion of all other persons." 802 S.W.2d at 323. Because under this

---

1. There was also testimony at trial indicating that the Sydnors failed to pay Cockrell, but the Bank foreclosed on the equipment before Cockrell took any formal action.

definition there was sufficient evidence to support the jury's answer, and because the Bank had not attacked any of the other jury findings, the court of appeals rendered judgment for Cockrell in accordance with the jury verdict, awarding $44,705 for the reasonable market value of the equipment on the date of sale and $15,000 in exemplary damages for the Bank's wanton disregard of Cockrell's rights. We granted the Bank's and the FDIC's application for a writ of error.[2]

The term "possession" is not defined in the Uniform Commercial Code, and we have found no decision specifically addressing whether "possession" under section 9.312(d) must be exclusive. Most of the cases construing the phrase "at the time the debtor receives possession of the collateral" have arisen when the debtor has had use of the collateral prior to sale or prior to execution of a security agreement. In *Mark Products U.S., Inc. v. InterFirst Bank Houston, N.A.,* 737 S.W.2d 389 (Tex. App.—Houston [14th Dist.] 1987, writ denied), for example, the plaintiff initially sold equipment to the purchaser on an unsecured basis and, after the buyer had in the interim procured a loan against the equipment from the defendant bank, the seller obtained from the buyer a promissory note for the balance of the purchase price and a security interest in the equipment. When the equipment was sold to satisfy the bank's security interest, the seller-financer sued the bank, asserting a first-priority security interest under section 9.312(d). The seller argued that the twenty-day grace period did not begin to run when the goods were delivered, because until execution of the security agreement, the purchaser was not a "debtor" in possession of "collateral."

Rejecting this argument, the court held for the bank, observing that "[w]here there is no ... notice of record [of a conflicting security interest] and where the debtor has been in possession for more than twenty days, a creditor may rely upon mere possession of the collateral as sufficient evi-

dence of ownership and extend credit without further inquiry." *Id.* at 393. The court criticized the seller's argument as "seriously undermin[ing] the importance of physical delivery in determining the priority of a purchase money security interest." *Id.*

In so deciding, the court was consistent with a number of other decisions that have resolved comparable issues by focusing on the date physical control of the collateral was transferred, rather than on the date the formalities of the transaction were completed or the conditions of the contract attendant to delivery were fulfilled. *See, e.g., In re Automated Bookbinding Services, Inc.,* 471 F.2d 546, 551–53 (4th Cir. 1972) ("possession" began when crates containing equipment arrived at buyer's plant, not when seller subsequently completed installation required by sales contract's terms of delivery); *In re Vermont Knitting Co.,* 98 B.R. 184, 188–89 (Bankr.D.Vt. 1989) (debtor possessed equipment once it arrived at business premises, even though it had not been set up for use); *In re Henning,* 69 B.R. 348 (Bankr.N.D.Ill.1987) (grace period began when cattle were delivered to ranch, not when debtor signed promissory note or security agreement). *See also James Talcott, Inc. v. Associates Capital Co.,* 491 F.2d 879, 882–83 (6th Cir. 1974) (debtor's initial possession of equipment under lease, not exercise of option to purchase, commenced grace period for filing). There are, however, several contrary decisions, *see, e.g., Brodie Hotel Supply, Inc. v. United States,* 431 F.2d 1316 (9th Cir.1970); *In re Miller,* 44 B.R. 716, 720 (Bankr.N.D.Ohio 1984); *Commerce Union Bank v. John Deere Industrial Equipment Co.,* 387 So.2d 787, 791 (Ala.1980), including one Texas case. *See State Bank and Trust Co. of Beeville v. First National Bank of Beeville,* 635 S.W.2d 807, 809 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

Of course, these cases do not resolve the issue before us; many of them, including

---

**2.** On March 8, 1990, while the case was pending before the court of appeals, the Comptroller of the Currency declared the Bank insolvent and appointed the FDIC as receiver. The court of appeals then added the FDIC as an appellee in the case.

*Mark Products,* turn more on the meaning of "debtor" or "collateral" than on the meaning of "possession," which is critical here.[3] Nonetheless, as these cases discuss the policy considerations that underlie section 9.312(d), they are useful in deciding whether or not the "possession" contemplated by section 9.312(d) is limited to complete and exclusive possession. In rejecting the proposition that "possession" did not occur until the knitting machines covered by the security interest were connected to computers and set up for use, *Vermont Knitting* noted that "Article 9 is a notice statute" which "simplified many of the more rigid and complex formalities of pre-Uniform Commercial Code law and made the information contained in the lien files of recording entities more accessible." *Vermont Knitting,* 98 B.R. at 189. To make the grace period triggered by "possession" dependent upon the seller's performance of installation work, the court noted, could allow the seller to "manipulate that time to the detriment of other creditors and quite possibly avoid Article 9's filing requirements altogether." *Id.*

The court in *Automated Bookbinding* was driven by similar concerns in choosing physical possession as the touchstone over contractually defined "tender of delivery":

> The ostensible ownership exercised through possession is demonstrated through simple physical control. One who controls the collateral possesses it, and leads others to believe it is his.
>
> . . . .
>
> Tender of delivery is a sales concept . . . which binds a buyer and seller to contractual conditions. It affects their rights against each other. It would be a serious error to allow those private conditions to affect the carefully defined rights of creditors under Article 9.
>
> . . . To define "possession" as requiring completion of tender of delivery

terms would permit a secured creditor to . . . avoid the filing requirement indefinitely.

*Automated Bookbinding,* 471 F.2d at 552–53.

Under these cases, "possession" in section 9.312(d) is interpreted in light of the impression conveyed to an observer not involved in the transaction, not according to private limitations contained in the contract between the buyer and seller. As commentators have noted, the UCC drafters' choice to have the purchase money priority rule turn on "possession," rather than on when the debtor obtains "rights" in the collateral (*see* § 9.203(a)(3)), indicates a desire that the commencement of the grace period be easily ascertainable. *See* 1B PETER COOGAN, WILLIAM HOGAN, DETLEV VAGTS, & JULIAN MCDONNELL, SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE § 19.02[3][a], at 19–36 (1987).

The definition of "possession" adopted by the court of appeals implicates these same concerns. During August and September, the equipment was located in the warehouse that had become the Sydnors' place of business, used for the business that the Sydnors were then managing, and operated by employees of the Sydnors. If, despite this ostensible possession, the Sydnors were not in "possession" within the meaning of section 9.312(d) because Cockrell and two of his employees retained access to the warehouse, then section 9.312(d) "possession" acquires a meaning different from the simple physical control that to outside parties suggests ownership rights.[4] Since the duration of Cockrell's supervision of the business was a matter of agreement between him and the Sydnors, the court of appeals' interpretation would also allow some manipulation of the grace period by the parties to the transaction, frustrating Article 9's scheme.

---

3. Cockrell argues not that the twenty-day grace period commenced on October 3 because that was when the security agreement was signed, but that it commenced on October 3 because it was not until then that the Sydnors had complete possession of the equipment.

4. In this case, of course, the Bank was not a creditor who lent money in reliance on the Sydnors' apparent possession of the property for more than twenty days during August and September. However, in construing section 9.312(d) we must consider other types of situations to which it could apply.

The purpose of the twenty-day grace period (which in most states is only ten days) is to enable the financer to keep its priority even when the debtor-purchaser demands immediate delivery of the goods. *See* 2 GRANT GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY § 29.5, at 800 (1965). That purpose is not thwarted by requiring the financer to file within twenty days of delivery even if, as here, the nature of the transaction requires the financer to maintain some control over the collateral beyond that twenty-day period.

Another consideration in interpreting section 9.312(d) is that, to the extent possible, "possession" in that section should be given a meaning harmonious with its use in other parts of Article 9. This consideration arguably weighs against our holding today, because with regard to a secured party's perfection by possession under section 9.305, it has been stated that possession must be "unequivocal, absolute and notorious." *Hutchison v. C.I.T. Corp.*, 726 F.2d 300, 302 (6th Cir.1984); *Transport Equipment Co. v. Guaranty State Bank*, 518 F.2d 377, 381 (10th Cir.1975); *Greenbush State Bank v. Stephens*, 463 N.W.2d 303, 308 (Minn.App.1990).

However, given the facts and rationale of those decisions, we do not believe that our holding gives a conflicting meaning to "possession." All of those cases involved a secured party who acquired less thorough and, more important, *less visible* possession of the collateral than the Sydnors did. In *Transport Equipment Co.*, the creditor contended that simply by having its employees present on the debtor's premises preparing to remove the collateral on the morning before a competing creditor filed a financing statement, it had perfected its interest by possession. *Transport Equipment Co.*, 518 F.2d at 380–81. In *Hutchison*, the collateral was likewise located on another entity's business premises, but the creditor claimed that its interest had been perfected by possession because it had a night watchman "keep an eye on the equipment." *Hutchison*, 726 F.2d at 301. Finally, in *Greenbush State Bank*, the tractor that was the subject of the security interest was shared by the secured party and the debtor, and moved between their two farms. *Greenbush State Bank*, 463 N.W.2d at 308.

In deeming the secured party's possession insufficient in each case, the courts relied, as we have, on the need for sufficient possession to alert other potential creditors to the secured party's interest. We do not believe that, if presented with a secured party exercising the degree of dominion that the Sydnors did, these courts would still have concluded that the notice function had not been fulfilled. Indeed, since the *Transport Equipment Co.* court concluded that a possessory interest somewhat comparable to Cockrell's (*i.e.*, employees on the debtor's business premises) was *insufficient* to give notice, we think the case supports our conclusion that notwithstanding Cockrell's employees the Sydnors had ostensible control sufficient to constitute "possession." The *Transport Equipment Co.* decision, in fact, relied heavily on *Automated Bookbinding*.

For the foregoing reasons, we think that the court of appeals erred in limiting "possession" in section 9.312(d) to a power over property exercisable to the exclusion of all other persons. Moreover, we do not see any other basis on which the jury verdict can be sustained. That the equipment was in the Sydnors' place of business beginning on August 1, 1985 was undisputed. It was similarly uncontested that the equipment was used in the Sydnors' business during the succeeding months, and Cockrell presented no evidence to suggest that the equipment was in some manner set aside or specially labeled to denote his purchase money interest in it. Because this undisputed evidence establishes the Sydnors' "possession" under section 9.312(d) as we conclude that section must be read, there is no evidence to support the jury finding that the Sydnors received possession within twenty days of October 7, 1985. The trial court's judgment n.o.v. was correct.

In light of our disposition of this point of error, we do not reach the FDIC's further contention that federal law exempts it from the award of exemplary damages imposed by the court of appeals.

We reverse the judgment of the court of appeals and render judgment that Cockrell take nothing from the Petitioners.

Concurring Opinion by GONZALEZ, J.

GONZALEZ, Justice, concurring.

I concur with the Court's opinion and judgment. I write separately, however, to address the FDIC's contention that federal law exempts it from the award of exemplary damages imposed by the court of appeals.

The trial court rendered judgment n.o.v. in favor of Citizens National Bank of Denton, Texas, but the court of appeals reversed and rendered a $59,705 judgment in favor of Cockrell. The judgment included $15,000 in exemplary damages against the FDIC. The FDIC asserts that the court of appeals erred in rendering judgment for exemplary damages because federal law exempts it from liability for such damages. Cockrell replies that the FDIC should not be allowed to raise this "defense" for the first time on appeal.

We recently considered this issue in *Larsen v. FDIC*, 835 S.W.2d 66 (Tex.1992). In *Larsen*, the FDIC argued that 12 U.S.C. § 1821(d)(13)(B)[1] allowed it to assert "*D'Oench, Duhme* defenses"[2] on appeal. After noting that this section has been interpreted by federal circuit courts only as a standing statute giving the FDIC as conservator or receiver all the rights and remedies it enjoys in its corporate capacity, we held that § 1821 does not give the FDIC the absolute new substantive right to assert *D'Oench, Duhme* defenses for the first time on appeal. We noted that absent fundamental error a court of appeals has no discretion to reverse an error-free judgment based on a new argument raised for the first time on appeal. *Larsen*, 835 S.W.2d at 74.

In support of its contention that the FDIC may not assert its sovereign immunity defense to exemplary damages for the first time on appeal, Cockrell relies on several state and federal decisions. Specifically, Cockrell relies upon *Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n.*, 885 F.2d 266 (5th Cir.1989), *Grubb v. FDIC*, 868 F.2d 1151 (10th Cir.1989), *Thurman v. FDIC*, 889 F.2d 1441 (5th Cir.1989), and *Federal Sav. and Loan Ins. Corp. v. Kennedy*, 732 S.W.2d 1 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). Each of these cases is distinguishable.

The question presented in the present case is **whether** the court of appeals has jurisdiction to award punitive damages against the FDIC in a pending case absent a waiver of sovereign immunity. However, the question presented in each of the federal circuit cases, as in *Larsen*, concerned when the FDIC could assert *D'Oench, Duhme* defenses.

In *Kennedy*, the court of appeals considered and denied the FSLIC's attempt to relitigate issues decided by final judgment before the FSLIC's appointment as receiver, holding that the FSLIC stands in the shoes of the insured depository institution with respect to that judgment. 732 S.W.2d at 3. The statute which gives the FDIC standing to assert rights as a receiver clearly requires the FDIC to abide by a judgment that has become final before it is appointed as receiver. 12 U.S.C. § 1821(d)(13)(A). Whether this provision would be construed as a waiver of sovereign immunity in a case where it was clear that the court would not have jurisdiction to render the judgment that has become final was not before that court and is not

---

1. As amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1821(d)(13) provides in pertinent part:

   (A) The Corporation [FDIC] shall abide by any final unappealable judgment of any court of competent jurisdiction which was rendered before the appointment of the Corporation as conservator or receiver.

   (B) In the event of any appealable judgment, the Corporation [FDIC] as conservator or receiver shall
   (i) have all the rights and remedies available to the insured depository institution (before the appointment of such conservator or receiver) and the Corporation in its corporate capacity ...

2. *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

before us in this case. The case before us today does not present a situation in which the FDIC is attempting to avoid the consequences of a prior final judgment.

It is well settled that agencies of the United States may not be held liable for punitive damages absent express Congressional authorization. *Missouri Pac. R.R. v. Ault*, 256 U.S. 554, 41 S.Ct. 593, 65 L.Ed. 1087 (1921); *Bank One, Texas, N.A. v. Taylor*, 970 F.2d 16, 33 (5th Cir.1992). Furthermore, if the judgment sought would expend itself upon the public treasury or domain or interfere with the public administration the suit will be construed as one against the United States requiring a waiver of sovereign immunity even if the United States was not a party in the original action. *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). "Sovereign immunity is a jurisdictional prerequisite which may be asserted at any stage of the proceedings, either by the parties or by the court on its own motion." *Taylor*, 970 F.2d at 34.

The Fifth Circuit has spoken recently on the power of the courts to award punitive damages against the FDIC. In *Taylor*, the district court awarded Taylor $5.2 million in punitive damages and additional damages under the treble damage provision of the Deceptive Trade Practices Act. On appeal, as a post-judgment intervenor, the FDIC maintained that sovereign immunity required a reversal of that award because the FDIC is an instrumentality of the United States. Taylor did not dispute the fact that the FDIC was immune from the suit but argued that the FDIC, as receiver of MBank, should not be permitted to assert new defenses unique to its status post-judgment. The court distinguished *Olney* and *Grubb* holding that punitive damages awards in those cases would not tax an agency of the United States nor offend sovereign immunity because the judgments would be satisfied out of supersedeas bonds which were never assets available to the FSLIC for distribution because the bonds were posted before the FSLIC was substituted. Taylor made no showing that an award of punitive damages would not affect the receivership estate; therefore, those cases were distinguishable. The court held that waiver of sovereign immunity was a jurisdictional prerequisite to an award of punitive damages requiring an express Congressional waiver that may be asserted at any stage of the proceedings. *Id.* 970 F.2d at 33–34.

The *Taylor* court noted that a different situation would have been presented, however, if the issue of sovereign immunity had been presented after a final unappealable judgment had been rendered because of the provisions found in 12 U.S.C. § 1821(d)(13)(A) which require the FDIC as receiver to abide by any final unappealable judgment rendered before its appointment as receiver.

In the present case, the trial court rendered judgment n.o.v. in favor of the Bank. The FDIC was not a party to the action until it was added as an appellee after this case was submitted upon appeal. When the court of appeals reversed and rendered judgment on the verdict, including punitive damages, the FDIC raised the issue of sovereign immunity. The FDIC raised the issue immediately after the only judgment that contained an improper order of punitive damages. This judgment had become neither final nor unappealable.

Because Cockrell has failed to show that an award of punitive damages would not interfere with the public administration of the assets of the receivership estate and that such an award would not expend itself from the public treasury by increasing the loss to the insurance fund, such an award would require a waiver of sovereign immunity. A waiver of sovereign immunity cannot be implied but must be unequivocally expressed. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). Furthermore, the government's consent to be sued must be construed strictly in favor of the sovereign. *United States v. Nordic Village, Inc.*, —— U.S. ——, ——, 112 S.Ct. 1011, 1014–15, 117 L.Ed.2d 181, 188 (1992). Because no waiver is present in this case, the court of appeals erred in rendering a judgment which included punitive damages against the FDIC. This is an additional reason to

reverse the judgment of the court of appeals.