**In re Gordon and Kathy MICHAELS, Debtors.**

**Gordon and Kathy MICHAELS, Plaintiffs,**

v.

**FORD MOTOR CREDIT COMPANY, F & M Bank of Slinger, State Bank of Newburg, John Deere Company, P & L Leasing, and Dairyland Equipment, Inc., Defendants.**

**Bankruptcy No. 92–23498–JES. Adv. No. 92–2239.**

United States Bankruptcy Court, E.D. Wisconsin.

June 21, 1993.

Michael G. Trewin, New London, WI, for plaintiff-debtors.

Kevin D. Mathews, Milwaukee, WI, for F & M Bank of Slinger n/k/a Associated Bank.

Roy L. Prange Jr., Madison, WI, for John Deere Co.

Harvey G. Samson, Appleton, WI, for Dairyland Equipment, Inc. and P & L Leasing.

Thomas J. King, Oshkosh, WI, trustee.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

This case concerns priorities among conflicting security interests in the same farm equipment. It is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

There are three disputes to be resolved in this case, each of which shall be separately addressed. They are identified as follows:

1. F & M Bank of Slinger n/k/a Associated Bank ("Bank") v. John Deere Company ("John Deere");

2. Bank v. Dairyland Equipment, Inc. ("Dairyland"); and

3. Bank v. P & L Leasing.

All of the farm equipment involved in these disputes was in the possession of the chapter 12 debtors, Gordon and Kathy Michaels

("Michaels"), when they filed their chapter 12 bankruptcy petition on May 26, 1992.

## Bank v. John Deere

On July 20, 1988, the Bank obtained a blanket security interest in all of Michaels' farm equipment, then owned or after acquired, which was perfected by the filing of a UCC financing statement on July 21, 1988 with the Washington County Register of Deeds. John Deere claims a purchase money security interest in certain farm equipment resulting from various sales made by Dairyland, an authorized John Deere dealer, to Michaels and which were thereafter financed through Deere Credit Services Inc.[1] Issues of priority of liens exist in six of the contracts between Dairyland and Michaels. The farm equipment in these six contracts is more specifically identified in the annexed Schedule "A." [2]

The legal issue in all six transactions is whether, under Wis.Stat. § 409.312(4) [3], John Deere's purchase money security interest ("PMSI") trumps the Bank's blanket security interest.[4]

Dairyland is a corporation engaged in the sale of John Deere equipment. It is owned and operated by Louis Neuville ("Louis") and his son, Peter Neuville ("Peter"). The Neuvilles also own and operate a separate corporation known as P & L Leasing ("P & L"). Michaels and the Neuvilles have had an on-going business relationship since 1977.

Michaels testified that he has purchased $600,000 to $700,000 worth of farm equipment from Dairyland, the bulk of which was financed through John Deere as installment sales and security agreements. These transactions were typically structured as follows: Michaels would sign a customer purchase order. Simultaneously or shortly thereafter, he would also sign various other documents including a John Deere loan contract-security agreement and a personal financial statement (not to be confused with a UCC financing statement) in anticipation of obtaining financing from John Deere. The equipment was delivered by Dairyland prior to approval of any financing. If John Deere approved the application, copies of the executed documents were returned to both Michaels and Dairyland. If the financing was rejected, Dairyland would be notified and alternate financing would be made. Peter testified that Dairyland would always be able to obtain other financing under those circumstances.

The parties have stipulated to the following facts:

1. All six UCC financing statements on the disputed contracts were filed more than 20 days after the purchase orders and loan contracts-security agreements were signed by Michaels.

2. The UCC financing statements in five of the six transactions (the only exception being the transaction involving the spreader) were filed more

---

1. Deere Credit Services Inc., a separate entity affiliated with John Deere Company, handles the financing of John Deere equipment for customers of John Deere dealers. For purposes of this decision, the interests of Deere Credit Services Inc. and John Deere Company are identical.

2. There were also four other transactions involving farm equipment in which both the Bank and John Deere hold security interests. This farm equipment consists of: (1) cultivator, (2) mulcher, (3) baler with ejector, and (4) windrower and platform. No dispute exists as to the priorities of the Bank and John Deere with respect to these transactions. John Deere also is not claiming any interest in the farm equipment involved in the "Bank v. Dairyland" and "Bank v. P & L" disputes.

3. 409.312 Priority among conflicting security interests in the same collateral.

(4) A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter.

4. It is questionable whether John Deere even holds a PMSI within the meaning of Wis.Stat. § 409.107, which is a requirement for qualification under Wis.Stat. § 409.312(4). However, because of the court's disposition of this controversy on other grounds, it is not necessary to address this question.

than 20 days after delivery of the equipment to Michaels.

There are other key facts which are in dispute and in which the parties have made the following assertions:

1. John Deere asserts that the spreader was delivered April 28, 1991, a date within the 20 day grace period for perfection under Wis.Stat. § 409.-312(4).

2. The Bank and Michaels assert that (a) the spreader was delivered in November or December of 1990 (more than 20 days before John Deere's UCC financing statement was filed) and (b) the date on the purchase order for the spreader was altered to bring it within the 20–day grace period for filing of the UCC financing statement.

█ The parties' differing positions revolve around the proper interpretation of the words "receives possession" as used in Wis.Stat. § 409.312(4). The Bank and Michaels maintain that "receives possession" means delivery and that, in order for John Deere to qualify for protection under Wis. Stat. § 409.312(4), it must have filed its UCC financing statements within 20 days after the equipment had been delivered to Michaels. They assert that John Deere failed to do so in all six transactions, thereby making the Bank's security interest paramount.[5]

John Deere urges the court to adopt a more expansive interpretation of the words "receives possession" as used in Wis.Stat. § 409.312(4). It contends that these words mean *either* delivery of the equipment *or* John Deere's acceptance of the loan contract-security agreement, whichever is later. Therefore, John Deere reasons that, because it filed five of the UCC financing statements within 20 days of acceptance of the loan contract-security agreements, these five UCC financing statements were timely filed and superior. John Deere fur-

ther argues that, because the sixth contract involving the spreader was filed within 20 days of the purported April 28, 1991 delivery date, its security interest in the spreader was also timely perfected. Under John Deere's rationale, it successfully complied with the requirements of Wis.Stat. § 409.312(4) and holds a validly perfected and paramount PMSI for all six transactions.

The key inquiry, therefore, centers on the meaning of "receives possession" as contemplated by Wis.Stat. § 409.312(4). This statute recites that the 20–day period within which a PMSI must be perfected begins when the buyer "receives possession" of the goods purchased. The word "possession" is not defined in the Uniform Commercial Code. Courts have interpreted "possession" either by the "physical control" standard or by the "obligation" standard. Jack T. Cornman, *When Is the Debtor "In Possession" Under UCC § 9–312(4)?*, 19 Ariz.St.L.J. 261, 263 (1987).

█ Under the "physical control" standard, possession takes place when the recipient physically acquires the property. This is based upon a policy of avoiding secret liens. Prompt perfection prevents others, including the first filed floating lienor, from being misled by the ostensible ownership of the person in possession. Peter F. Coogan, et al., *Secured Transactions Under the Uniform Commercial Code*, U.C.C.Serv. (Bender) § 7B.09(5)(A) (1992). *Matter of Badger Aluminum Extrusion Corp.*, 7 B.R. 251 (Bankr.S.D.N.Y. 1980). Under the "physical control" standard, "to possess" means to "gain or exert influence or control, dominate; to cause to own (or) hold something, such as property." "Possession" is triggered by physical control. *See Matter of Badger Aluminum Extrusion Corp., supra; In re Vermont Knitting Co., Inc.*, 98 B.R. 184, 188 (Bankr. D.Vt.1989), quoting from the *American Heritage Dictionary*, 9967 (2nd College Ed., 1985). *See also* Wis.Stat. § 402.-

---

5. The court understands why Michaels has aligned himself with the position of F & M Bank. Michaels has acknowledged that F & M Bank has a potential non-dischargeability claim against him. If the Bank succeeds in establish-

ing priority over the interest of John Deere, this would either eliminate or substantially reduce Michaels' exposure on the non-dischargeability claim.

103(1)(c) which defines the term "receipt" of goods as "taking physical possession of them." Michaels and the Bank rely upon this reasoning.

■ Under the "obligation" standard, upon which John Deere relies, it is the commitment to purchase by virtue of the underlying contract, rather than physical possession, which controls. Some courts have followed this approach. *See, e.g., Brodie Hotel Supply Inc. v. U.S.*, 431 F.2d 1316 (9th Cir.1970); *Matter of Ultra Precision Industries, Inc.*, 503 F.2d 414 (9th Cir.1974); *Matter of Hooks*, 40 B.R. 715 (Bankr.M.D.Ga.1984); and *In re McHenry*, 71 B.R. 60 (Bankr.N.D.Ohio 1987). This school of thought has been severely criticized as "undermin[ing] seriously the importance ascribed by § 9–312(4) to the fact of delivery for the purpose of determining priority of a purchase money security interest." Kennedy, *Secured Transactions*, 27 Bus.Law. 755, 768 (1972). *See also Mark Products U.S., Inc. v. Interfirst Bank Houston, N.A.*, 737 S.W.2d 389 (Tex.Ct. App.1987); Comment, *Uniform Commercial Code—Protection for the purchase money secured party under § 9–312*, 49 N.C.L.Rev. 849 (1971).

Furthermore, the "obligation" standard cases are factually distinguishable from the case at bar. In *Brodie*, the prospective purchaser had the use of the restaurant equipment for five months before the purchaser was under any obligation to complete the transaction and during that period of time the parties were still negotiating. The court in *Brodie* held that, under those circumstances, the grace period for filing did not commence until the transaction had been completed. In *Ultra Precision* and *Hooks*, the property was conditionally shipped to the prospective buyers, who were afforded the opportunity to test the property before becoming committed to buy them. In *McHenry*, the debtor did not sign the note obligating him to purchase the property (an automobile) until after he was first given the use of the vehicle.

■ Unlike *Brodie, Ultra Precision,* and *McHenry*, Michaels became obligated to purchase the farm equipment when he signed each purchase order with Dairyland. In all sales transactions, this took place before delivery. The following language, contained in each purchase order, obligated Michaels to Dairyland for the purchase of the property:

I (We) promise to pay the balance due (line 7) shown above in cash, or to execute a Time Sale Agreement (Retail Installment Contract), or a Loan Agreement, for the purchase price of the equipment, plus additional charges shown thereon, on or before delivery of the Equipment ordered herein.

Nothing in any of the purchase orders gave Michaels the right to back out of the deal or conditionally purchase the farm equipment. The only question remaining after Michaels signed each purchase order was how he would pay for the equipment. Financing from John Deere or from anyone else was never made a condition of any sale from Dairyland to Michaels. After Dairyland, as seller, and Michaels, as purchaser, signed the purchase order, the transaction became a completed sale, notwithstanding Dairyland's reservation of title. *See* Wis. Stat. §§ 401.201(37)(a), 402.401(1), and 409.-202.

■ The court is persuaded that the "physical control" standard provides the better approach. It reduces the risk of mistaken reliance by potential or existing creditors on the debtor's apparent ownership of assets. It promotes the underlying policies of the Uniform Commercial Code in affording certainty, predictability for commercial transactions, and public disclosure. *See supra,* Cornman, 19 Ariz.St.L.J. at 263; *In re Automated Bookbinding Services, Inc.*, 471 F.2d 546 (4th Cir.1972); *In re Ivy*, 37 B.R. 285 (Bankr.E.D.Ky.1983); *In re Vermont Knitting Co., Inc.*, 98 B.R. 184 (Bankr.D.Vt.1989); *In re Henning*, 69 B.R. 348 (Bankr.N.D.Ill.1987) (possession of the collateral by the debtor is the appropriate measuring date, the court specifically declining to follow *Brodie); In re Relpak Corp.*, 25 B.R. 148 (Bankr.E.D.N.Y.1982); *In re Ivie & Associates, Inc.*, 84 B.R. 882 (Bankr.N.D.Ga.1988). *In re O'Hara Bros., Inc.*, 151 B.R. 702 (Bankr.E.D.Pa.1993). In

contrast, the "obligation" standard relied upon by John Deere provides an opportunity for mischief and transforms the 20–day grace period into an open-ended time for perfection. It gives potential PMSI creditors the ability to delay or entirely avoid the filing requirement. *See supra,* Cornman, 19 Ariz.St.L.J. at 277. In *James Talcott Inc. v. Associates Capital Company, Inc.,* 491 F.2d 879, 882–83 (6th Cir.1974), the court declared:

> It would be a frustration of this purpose [certainty in commercial transactions under the U.C.C.] to hold that a purchase money secured party can deliver goods to his debtor, delay indefinitely before entering into a security agreement which binds the debtor retroactively as of the delivery date, and still obtain a perfected security interest by filing within ten days of the agreement.[6]

■ John Deere also argues that the 20–day perfection period can only start after John Deere has signed the loan contract-security agreement because, until then, Michaels is not a "debtor" of John Deere and the farm equipment is not "collateral." That argument was also raised in *NBD–Sandusky Bank v. Ritter,* 179 Mich. App. 580, 446 N.W.2d 340 (1989), reversed on other grounds 437 Mich. 354, 471 N.W.2d 340 (1991), and in *North Platte State Bank v. Production Credit Association of North Platte,* 189 Neb. 44, 200 N.W.2d 1 (1972), but was rejected by both courts. The words "debtor" and "collateral" as used in § 409.312(4) are words of identification only. Louis W. Payne, *Uniform Commercial Code—Protection for the Purchase Money Secured Party Under § 9–312,* 49 N.C.L.Rev. 849, 853 (1971). "Debtor" and "collateral" are not used in the statute to fix the time within which the 20–day period for perfection is to commence. *See supra,* Cornman, 19 Ariz.St. L.J. at 266. In *Mark Products U.S., Inc. v. Interfirst Bank Houston, N.A., supra,* the court observed that the word "debtor" refers to a person or entity who is obligated or *ultimately becomes* obligated, and similarly, the word "collateral" refers to property which is either subject to a security interest or *ultimately becomes* subject to a security interest (emphasis added).

■ The remaining loose end in this particular controversy concerns the delivery date of the spreader. It is uncontroverted that John Deere accepted in writing the loan contract-security agreement more than 20 days before the UCC financing statement was filed. Under John Deere's approach, it can therefore only prevail if it proves that the UCC financing statement was filed less than 20 days after delivery of the spreader. Peter testified that delivery was on April 28, 1991 (within the 20–day period). He admitted that he altered the date of delivery on the purchase order from April 20, 1991 to April 28, 1991, but said he did so to reflect the actual time when, according to him, delivery took place. If delivery was on April 20, 1991, this would prove fatal to John Deere's position because the UCC financing statement, having been filed May 16, 1991, took place more than 20 days later. Michaels testified that the actual delivery was even earlier and occurred "in November or December of 1990."

The testimony of Peter and Michaels directly contradict each other on this issue. This court has observed their demeanor and finds Michaels' testimony to be more credible. Peter's explanation for altering the delivery date of the purchase order is suspect. He could have produced inventory sheets in an effort to corroborate his testimony, but failed to do so.

The court, relying upon Michaels' testimony, finds that, although the precise date of delivery is unclear (either on April 20, 1991 or sometime in November or December of 1990), in any event, it took place more than 20 days before John Deere's UCC financing statement was filed.

### Bank v. Dairyland

■ This dispute is over an 8760 John Deere tractor. The question is whether a May 26, 1992 agreement between Michaels

---

**6.** Although *Talcott* involved an Ohio statute which contained a 10–day requirement for filing, many states (including Wisconsin) have a 20–day grace period.

and Dairyland covering this tractor was a true lease or a lease disguised as security for an installment sale ("disguised security agreement"). If the agreement is a disguised security agreement, Dairyland's failure to file a UCC financing statement perfecting its interest in the tractor renders its interest subordinate to the Bank.

 Michaels tried to prove that this agreement was a lease through prior oral discussions he had with the Neuvilles. Parol evidence under Wisconsin case law prevents prior expressions of intent which conflict with a specific provision of the agreement even though the agreement itself may be incomplete. *Federal Deposit Insurance Corp. v. First Mortgage Investors,* 76 Wis.2d 151, 250 N.W.2d 362 (1977); *In re Spring Valley Meats, Inc.,* 94 Wis.2d 600, 288 N.W.2d 852 (1980); *Conrad Milwaukee Corp. v. Wasilewski,* 30 Wis.2d 481, 141 N.W.2d 240 (1966); *Morn v. Schalk,* 14 Wis.2d 307, 111 N.W.2d 80 (1961). Because Michaels' testimony specifically conflicts with paragraph 7 of the agreement (which labelled the document as "an agreement for rental only"), oral testimony on this particular issue must be disregarded.

 However, that does not end this court's inquiry into this controversy. The version of Wis.Stat. § 401.201(37)(b) which was then applicable [7] read, in part, as follows:

Whether a transaction creates a lease or security interest is determined by the facts of each case.

Although the parties to this agreement are designated as "lessor" and "lessee," the agreement is called a "Rental Agreement," and a provision in the agreement declares that "this is an agreement for rental only," these features are not controlling. The parties cannot change the legal effect of the agreement simply by giving it a name. *In re Loop Hospital Partnership,* 35 B.R. 929 (Bankr.N.D.Ill.1983); *In re Noack,* 44

B.R. 172 (Bankr.E.D.Wis.1984); *In re Tulsa Port Warehouse Co., Inc.,* 4 B.R. 801, 805 (N.D.Okla.1980); *In re Coors of the Cumberland, Inc.,* 19 B.R. 313, 316 (Bankr.M.D.Tenn.1982); *Orix Credit Alliance Inc. v. Pappas,* 946 F.2d 1258 (7th Cir.1991). The Uniform Commercial Code asks a court to look at the substance of the underlying transaction, not the technical language of the agreement. *In re Powers,* 983 F.2d 88, 91 (7th Cir.1993). *See also Matter of Marhoefer Packing Co., Inc.,* 674 F.2d 1139, 1142 (7th Cir.1982), where the court proclaimed that the drafters of the Uniform Commercial Code, in defining the term "security interest" to include a lease intended as security, refused to recognize form over substance. The true intent of the parties must be determined from the language of the whole document rather than by particular words or isolated phrases. *See In re Loop Hospital Partnership, supra; Hudson Insurance Co. v. Gelman Sciences Inc.,* 921 F.2d 92 (7th Cir.1990); *The Trustees of First Union Real Estate Equity and Mortgage Investments v. Mandell,* 987 F.2d 1286 (7th Cir. 1993). In the final analysis, the facts of each case are determinative on this issue. *In re Tucker,* 34 B.R. 257, 260 (Bankr. W.D.Okla.1983).

 In the instant case, the agreement is sketchy. Many of its provisions are incomplete, thereby making it very difficult to decipher the parties' true intent. The document, while containing provisions for the "total present value" of the tractor, termination date of the agreement, and "minimum rental guaranteed by lessee," were all left incomplete. They were neither filled in nor deleted. The agreement granted to Michaels an option to purchase, which reads as follows:

Upon expiration of the term of this Rental Agreement or at any time during such term, Lessee may elect to purchase the Equipment for the "Total Present Value" shown above, and may apply to such

7. The current version of Wis.Stat. § 401.201(37) does not govern the facts in this case because this statute was revised effective July 1, 1992 and the agreement was entered into on May 26, 1992. The general rule of statutory construction is that statutes are to be construed as relating to future and not to past acts. *Gutter v. Seamandel,* 103 Wis.2d 1, 17, 308 N.W.2d 403 (1981).

purchase price _____% of all rentals theretofore paid.

The omission of the "expiration of the term of this rental agreement," "total present value," and "minimum rental guaranteed" as well as the failure to specify a "percentage of all rentals paid" make it impossible to compute the option price. Where a lessee may terminate a lease at any time without penalty or further obligation, this is an indication of a true lease. *In re Powers*, 983 F.2d at 91. On the other hand, where the lessee is contractually bound to pay rent over a set period of time at the conclusion of which the lessee automatically or for only a nominal consideration becomes the owner of goods, the transaction is, in substance, a conditional sale. *In re Marhoefer Packing Co., Inc.*, 674 F.2d at 1142. The existing ambiguities make it impossible to analyze this case in the light of established guidelines.

▮▮▮ The agreement is also silent as to who has the responsibility for paying taxes in connection with the tractor and who, as between Dairyland and Michaels, has the responsibility for providing property insurance.[8] The agreement does, however, state that Michaels expressly assumes responsibility for all operating and maintenance expenses, which suggests that Michaels acquired a property interest and that the document in question is a security agreement. *In re Noack*, 44 B.R. at 175; *In re Tucker*, 34 B.R. at 261. The court recognizes that this factor alone is not conclusive.

Overall, this agreement is woefully incomplete and ambiguous. It is a well established principle of law that an ambiguous document shall be construed against its drafter. *Matter of Smith Management Inc.*, 8 B.R. 346, 349 (Bankr.W.D.Wis.1980); *Matter of Kohl*, 18 B.R. 670, 672, n. 1 (Bankr.W.D.Wis.1982); *Spring Valley Meats Inc.*, 94 Wis.2d at 609, 288 N.W.2d 852; *In re Noack*, 44 B.R. at 176; *Crescent Corp. v. Proctor & Gamble Co.*, 898 F.2d 581, 584 (7th Cir.1990); *Matter of Glad-*

*stone Glen*, 739 F.2d 1233, 1238 (7th Cir. 1984); *Advance Process Supply Co. v. Litton Industries Credit Corp.*, 745 F.2d 1076, 1079 (7th Cir.1984). In the case at bar, Dairyland was the drafter.

Under all of these circumstances, the court finds that the document is a disguised security agreement, not a true lease, and because it was never perfected, the Bank's interest prevails over Dairyland's interest.

### Bank v. P & L

▮▮▮ The final contest is over a 4250 John Deere tractor, loader, and two grain drills, evidenced by two "rental agreements" between P & L and Michaels dated June 13, 1988 and June 22, 1988, respectively. It is P & L's position that the agreements are true leases, and the equipment in question belongs to it. Alternatively, P & L asserts that, even if these documents are construed as installment sales, they were perfected by P & L's timely filing of UCC financing statements.

▮▮▮ Both arguments are flawed because neither agreement was signed by Michaels. Michaels' uncontroverted testimony was that his signature on both documents was forged. P & L did not refute this testimony. Peter acknowledged that he was not involved in any of the P & L transactions and that they were handled exclusively by Louis. Louis, while present as a spectator during the trial, did not testify. Where there is a failure on the part of a witness to testify, the court can draw an inference that such testimony would have been unfavorable. *In re McGohan*, 75 B.R. 10, 13 (Bankr.N.D.N.Y. 1986); *Matter of Grace*, 22 B.R. 653, 657 (Bankr.E.D.Wis.1982).

▮▮▮ Because the court concludes that Michaels' signature on each of the documents was forged, it may consider Michaels' oral discussions with Louis unimpeded by the parol evidence rule. Michaels testified that he intended to purchase all of

---

**8.** The agreement does recite that, if John Deere accepts financing, it will provide physical damage insurance. Absent such acceptance by John Deere, however, it is unclear who otherwise has this responsibility.

the equipment in question, rather than lease it. The court accepts Michaels' testimony and finds that his transactions with P & L were installment sales. Although UCC financing statements were filed covering the equipment in question, there were no written security agreements. The filing of a UCC financing statement alone does not establish a security interest, but indicates merely that the party who has filed "may have a security interest in the collateral described." Uniform Commercial Code § 9–402 Official Comment 2. The mere reflection of collateral on a UCC financing statement without a corresponding security agreement reflecting an intent to grant a secured interest in certain property does not establish an enforceable security interest in such property. *In re Hoyt's, Inc.*, 117 B.R. 226, 228 (Bankr.N.D. W.Va. 1990). *See also In re North Redington Beach Associates, Ltd.*, 97 B.R. 90 (Bankr. M.D.Fla.1989); *Matter of Don Miller, Inc.*, 35 B.R. 714 (Bankr.E.D.Wis.1984); *Barth Bros. v. Billings*, 68 Wis.2d 80, 88, 227 N.W.2d 673 (1975). Wis.Stat. § 409.203 states that a security interest is not enforceable against either the debtor or third parties and does not attach unless the collateral is in the possession of the secured party or the debtor has signed a security agreement. Since neither of these requirements was met, P & L's security interest never attached, and the Bank prevails.

### Conclusion

The extremely casual manner in which the Neuvilles conducted business explains to a large degree why and how the problems in this case arose. The paperwork covering the farm equipment and the perfection of John Deere's security interests were clumsily handled. The Bank's interest in all of the disputed farm equipment is superior to the competing lien interests of John Deere, Dairyland, and P & L.

This decision shall stand as and for findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

SCHEDULE A

| FARM EQUIPMENT | DATE MICHAELS SIGNED PURCHASE ORDER | DATE OF DELIVERY OF FARM EQUIPMENT TO MICHAELS | DATE MICHAELS SIGNED JOHN DEERE LOAN CONTRACT/SECURITY AGREEMENT | DATE JOHN DEERE SIGNED JOHN DEERE LOAN CONTRACT/SECURITY AGREEMENT | DATE OF PERFECTION OF SECURITY INTEREST |
|---|---|---|---|---|---|
| Rotary hoe | March, 1990 | June 10, 1990 | Michaels denies signing | September 4, 1990 | August 20, 1990 |
| Flexfold planter | May 20, 1990 | May 20, 1990 | Michaels denies signing | September 18, 1990 | August 20, 1990 |
| Spreader | April 20, 1991 | In dispute—one of the following dates: –April 20, 1991 –April 28, 1991 –November, 1990 –December, 1990 | April 20, 1991 | April 25, 1991 | May 16, 1991 |
| Combine, platform and corn head | January, 1991 | July 16, 1991 | July 24, 1991 | August 26, 1991 | August 29, 1991 |
| Mulch finisher | November or December, 1990 | May 20, 1991 | July 24, 1991 | August 26, 1991 | August 29, 1991 |
| 4650 Tractor | Debtor does not recall if he signed purchase order | June, 1990 | July 24, 1991 | August 26, 1991 | August 29, 1991 |

## ORDER DECLARING PRIORITY OF SECURITY INTERESTS

In accordance with the decision of this court filed this date determining the priority of conflicting security interests among F & M Bank of Slinger n/k/a Associated Bank, John Deere Company, Dairyland Equipment, Inc. and P & L Leasing,

IT IS ORDERED that the security interest of F & M Bank of Slinger n/k/a Associated Bank be declared to have priority over

the conflicting security interests of John Deere Company, Dairyland Equipment, Inc., and P & L Leasing.