**FEDERAL DEPOSIT INSURANCE COR- PORATION, as receiver for MBank Houston–National Association, Appellant,**

v.

**GOLDEN IMPORTS, INC. and Michael J. Montalbano, Appellees.**

No. 01–88–00307–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 12, 1993.

---

David Speed Elder, Susan L. Bickley, Houston, for appellant.

James R. Ansell, Galveston, Otto D. Hewitt, III, Evelyn T. Ailts, William T. Green, Houston, for appellees.

Before DUGGAN, O'CONNOR and HEDGES,* JJ.

## OPINION ON MOTION FOR REHEARING

DUGGAN, Justice.

This is an appeal from a judgment against MBank in a suit for conversion. We withdraw our opinion of October 10, 1991, and substitute this opinion in its place.

### Motion for Substitution

MBank Houston National Association (MBank)[1] had already perfected its appeal from the trial court's final judgment, when, on March 28, 1989, it was declared insolvent and the Federal Deposit Insurance Corporation (FDIC) was appointed as receiver. On June 7, 1989, the FDIC moved for leave to substitute the FDIC as receiver for appellant, MBank; we granted that motion in our original opinion in this cause, issued on December 21, 1989, and the caption of the cause was amended to reflect the substitution. In the interest of clarity, however, references to "appellant" will mean MBank, unless otherwise indicated. The clerk has filed the briefs of the FDIC.

---

* The Honorable Frank G. Evans, former Chief Justice, Court of Appeals, First District of Texas at Houston, participated in the original opinion and the January 31, 1991, opinion on motion for rehearing. Chief Justice Evans retired on January 31, 1991, and did not participate in the October 10, 1991, opinion on motion for rehearing, or in this opinion. Justice Hedges participated in the third motion for rehearing, on April 27, 1993.

1. Also known as Gessner Southwest Bank & Trust and Capital Bank–Gessner.

*Motions for Rehearing*

On January 15, 1990, appellant moved for rehearing. We granted appellant's motion for rehearing and withdrew our December 21, 1989, opinion on January 31, 1991, and substituted a second opinion. On February 14, 1991, appellant filed its second motion for rehearing and appellee, Golden Imports, Inc., then filed its motion for rehearing. On October 10, 1991, we denied appellant's second motion for rehearing; granted appellee's motion for rehearing; withdrew our January 31, 1991, opinion; and issued a third opinion in this cause. On November 8, 1991, appellant filed its third motion for rehearing.

We hereby deny appellant's third motion for rehearing, and withdraw our October 10, 1991, opinion. We reverse that portion of the judgment below requiring MBank (and the FDIC as receiver) to pay Golden Imports' and Montalbano's attorney's fees, and render judgment that Golden Imports and Montalbano receive no attorney's fees. We also reverse that portion of the judgment below awarding Golden Imports punitive damages, and render judgment that Golden Imports receive no punitive damages.

The remainder of the judgment is affirmed.

*Facts and Procedural Background*

The judgment against MBank, signed February 1, 1988, (1) awarded appellee, Golden Imports, $32,475 in actual damages, $100,000 in punitive damages, and pre- and postjudgment interest, and (2) awarded intervenor, Michael Montalbano, title to the BMW automobile made the subject of this suit. Both Golden Imports and Montalbano were awarded attorney's fees and court costs. Montalbano's motion for judgment nihil dicit against Motorcar Warehouse, Inc. was granted only on liability. MBank asserts nine points of error. The FDIC raises additional points in a reply brief.

The basic facts are not in dispute. In late 1982, Montalbano wanted to buy a 1983 lapis blue BMW 733i automobile for his wife, and visited Motorcar Warehouse, Inc. (MWI) in Houston. Although this specific car was not on the lot, MWI's owner, David Tips, told Montalbano he would telephone him if he could locate such a car. Thereafter, Tips found the BMW through Jim O'Brien, a salesman at Golden Imports in Beaumont, who located it through Bavarian Motors in Tulsa, Oklahoma.

On December 3, 1982,[2] upon hearing from Tips that MWI had obtained the BMW, Montalbano tendered payment in full to MWI by two separate checks in amounts of $16,000 and $18,953.30.[3] Montalbano took possession of the car and assumed that its title would be forwarded to him shortly. MWI deposited Montalbano's two checks into its general operating account at MBank (the account) on December 6, 1982.

At the time, MWI had a floor plan financing account with MBank (the loan agreement) for approximately $400,000, which was secured by an interest in MWI's account and its inventory. Under the loan agreement, MBank extended MWI a line of credit to purchase vehicles as inventory for sale, with MBank holding the vehicles' titles.[4]

On December 13, 1982, Tips died. Tips' death constituted a default under the loan agreement. MBank learned of Tips' death on December 14, when Gene Russell, chairman and chief executive officer of the bank, called MWI's office and spoke to Janie Gonzales, Tips' secretary who "handled all of his bookkeeping, payroll, everything for almost all of the companies that he [Tips] had." The purpose of his call was to inquire about some funds that MWI had deposited into an account belonging to Re-

---

**2.** For personal reasons, Montalbano changed the date on the checks to reflect that the purchase had been made on December 2, 1982.

**3.** Golden Imports charged MWI $32,475 for the car, and MWI's total sale price to Montalbano was $34,953.30.

**4.** MWI/Tips also had two additional, smaller loans with MBank in the amounts of $7,000 and $9,500.

print, another business owned by Tips.[5] During that same conversation, Gonzales testified, she also told Russell that

> we were expecting some drafts to come in, that we had the money in the bank to pay for them, and he said ... "David has lots of cars, some cars that he has floored way over the value. So at this time nothing is going to be paid. We can only pay whoever is working there."

She went on to say that she told Russell at that time that there were funds in the account that were designated to pay an outstanding draft to Golden Imports on the Montalbano transaction. The deposit slip for those funds identified their relation to that transaction, by notations of Montalbano's name and of the make and model and stock number of the car. Gonzales testified those notations were intended to indicate that the funds deposited were held by MWI for someone else.

Russell then sent a consultant to MWI's place of business to "lay his hands on our collateral"—that is, he later explained, to go out and look at the collateral and report back on its location, condition, value, and adequacy to secure the outstanding indebtedness. Russell received the consultant's report on the morning of December 15, and that day the bank sent MWI a demand letter that the full amount of that indebtedness be paid immediately. Also on the fifteenth, the bank authorized the withdrawal of funds from MWI's demand deposit account, to offset against MWI's indebtedness to the bank. That withdrawal was effected on December 16, when MBank withdrew $92,678.63 from MWI's account. Thus, there were no funds in MWI's account to pay MWI's draft in the amount of $32,475 to Golden Imports when it was presented at MBank sometime between December 16 and December 21. When the draft was dishonored, Golden Imports did not forward the BMW title to Montalbano.

**5.** Upon learning from Gonzales that the funds had been mistakenly deposited to the wrong account, Russell transferred the funds into the MWI account. MWI's bank statement for December 1982 reflects a deposit of $66,002.60 on

*MBank's Points of Error*

By its first three points of error, MBank asserts the trial court erred in its submission of special issue number one, which inquired:

> Do you find from a preponderance of the evidence that on the occasion in question [the bank] converted money belonging to Golden Imports, Inc.?

The jury answered "YES."

MBank's first point of error complains that the trial court erred in submitting special issue number one because (1) as a matter of law, money can be converted only when it can be identified specifically, but not when it is used generally to discharge a debt, and (2) the evidence is factually insufficient to support a finding that MBank converted money belonging to Golden Imports.

In determining "no evidence" points, we consider only the evidence and inferences that tend to support the jury finding, and disregard all evidence and inferences to the contrary. *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985). In reviewing all questions of "factual sufficiency," regardless of whether the complaining party had the burden of proof on the issue, we consider and weigh all the evidence, both in support of, and contrary to, the challenged finding. The finding must be upheld unless the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, as to be manifestly erroneous or unjust. *In re King's Estate,* 244 S.W.2d 660, 661 (Tex.1951); *M.J. Sheridan & Son v. Seminole Pipeline Co.,* 731 S.W.2d 620, 623 (Tex.App.—Houston [1st Dist.] 1987, no writ).

In special issue number one, the jury found that "MBank converted money belonging to Golden Imports." The court's charge defined "conversion":

> The terms, 'converted' and 'converting', as used in this charge, mean the unlaw-

December 14, 1982, which raised the account balance from $26,676.03 to $92,678.63. Gonzales' testimony was sufficient to support an inference that that deposit was the transfer of funds that Russell effected.

ful exercise of dominion, ownership or control by one party over the property of another to the exclusion of the exercise of the same rights by the owner, either permanently or for an indefinite time. Money is a subject of conversion only when it can be described specifically, as opposed to discharging a debt by payment of money generally.

When a person designates a particular use for proceeds from a check, those proceeds are "specific money" capable of conversion. *Security State Bank v. Valley Wide Elec. Supply Co.,* 752 S.W.2d 661, 665 (Tex. App.—Corpus Christi 1988, writ denied). Both Montalbano's checks, deposited in MWI's account, and MWI's deposit slip, identified the deposited funds as relating to the BMW purchase. Gonzales, Tips' secretary, testified that the day after Tips died, she told Russell there were funds in MWI's account designated for Golden Imports. Nothing in the record indicates that she told Russell the exact amount due Golden Imports.

■ Russell testified about the bank's security interest in MWI's inventory, proceeds, and accounts on deposit. He testified that the security agreement expressly stated that "any deposit credited to the obligor is pledged to the performance of the note"; that MWI's account at MBank was not a special account or trust account; and that MBank had no prior agreement with MWI to use Montalbano's checks to pay Golden Imports. In sum, MBank argues, it exercised its right as a secured creditor to seize unrestricted funds from a bank account in which it had a perfected security interest.

■ If this case were simply a priority dispute under Tex.Bus. & Com.Code Ann. § 9.201 (Vernon 1991), MBank's security interest in MWI's account would normally entitle it to set off any funds on deposit at the time of MWI's default. However, Texas courts follow the equitable exception to a bank's right of set-off. *National Indem. Co. v. Spring Branch State Bank,* 348 S.W.2d 528, 531 (Tex.1961); *Allied Bank West Loop v. C.B.D. & Assoc.,* 728 S.W.2d 49, 58 (Tex.App.—Houston [1st Dist.] 1987,

writ ref'd n.r.e.). Under the equitable setoff rule, MBank would be

> charged with the duty of making the inquiry which, if made, would disclose the fact that the funds were held by the depositor as a fiduciary; and, *furthermore even where innocently seized,* the funds must be yielded up to the equitable owner when the entrustment fact is established unless he who is in possession can and does show that he has changed his position to his injury so that it would be inequitable to require him to yield up the funds.

*Continental Nat'l Bank v. Great Am. Management & Inv.,* 606 S.W.2d 346, 348 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.) (emphasis in original).

■ The bank cites no authority, and we find none, stating that a bank's perfected security interest under the Texas Uniform Commercial Code exempts the bank from the equitable exception to the right of set-off.

■ After accelerating MWI's loan and seizing the collateral, MBank did not change its position to its detriment. Therefore, under the equitable rule, even if MBank was not initially at fault in seizing the account, it had a duty to make further inquiry when it received information that funds were being held for the specific purpose of paying Golden Imports, and to turn over the funds when it learned that funds were indeed being so held. Sufficient evidence supports the jury's finding of conversion in special issue number one.

MBank's first point of error is overruled.

■ In its second point of error, MBank contends that the court erred in submitting special issue number one because it improperly commented on the weight of the evidence. However, MBank did not so object at trial; therefore, the objection is waived. *See Dayton Hudson Corp. v. Altus,* 715 S.W.2d 670, 675 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.), *cert. dismissed,* 481 U.S. 1073, 107 S.Ct. 2471, 96 L.Ed.2d 364 (1987) (error raised on appeal did not comport with objection at trial; held

waived); TEX.R.CIV.P. 272, 274; TEX. R.APP.P. 52(a).

MBank's second point of error is overruled.

In its third point of error, MBank asserts that the trial court erred in submitting special issue number one, because there was no evidence or, alternatively, insufficient evidence, to support the jury's finding that the money converted by MBank belonged to Golden Imports. Alternatively, appellant complains that the answer is against the great weight and preponderance of the evidence. In special issue number one, the jury found that MBank "converted money belonging to Golden Imports." As stated earlier, MWI's secretary and bookkeeper Gonzales told MBank's chairman Russell on the day after Tips' death that there were funds in MWI's account earmarked to pay Golden Imports. Golden Imports also introduced MWI's deposit slip and Montalbano's cancelled checks, each of which identified the deposited funds as related to the BMW purchase.

In *Houston National Bank v. Biber*, 613 S.W.2d 771, 774–75 (Tex.Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.), the court held that a check, if deposited into a bank account, may be converted if the amount is identifiable, and "with knowledge of its [trust] character, it is applied by the bank in which it is held in trust to reduce the debt of the depositor to the bank." Likewise, a bank was held liable for the conversion of its customer's account, despite evidence that the checks themselves did not specify any part that was being held for a third party. *Security State Bank*, 752 S.W.2d at 665. "[I]t is the bank's duty to segregate the funds in a mixed account before applying any to overdrafts." *Id.* No special issue was submitted inquiring specifically whether the money in MWI's account was owned by Golden Imports. If factually sufficient evidence exists to support an omitted element from a ground of recovery found by the jury, and the court makes no written findings, the omitted element is deemed found in support of the judgment. *County of Burleson v. General Elec. Capital Corp.*,

831 S.W.2d 54, 57 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *General Accident Fire & Life Assurance Corp. v. Murphy*, 339 S.W.2d 392, 399 (Tex.Civ. App.—Houston [1st Dist.] 1960, writ ref'd n.r.e.); TEX.R.CIV.P. 279. Here, the trial court made no written findings, and we conclude that sufficient evidence exists to support the missing element of the jury's finding that MBank converted money that "belonged to" Golden Imports.

MBank's third point of error is overruled.

By its fourth point of error, MBank urges the trial court erred in refusing to grant its motion for judgment notwithstanding the verdict with respect to special issue number six, because the car was MWI's "inventory" as a matter of law. Alternatively, MBank asserts that the jury's failure to find that the car was MWI's "inventory" was against the great weight and preponderance of the evidence.

Special issue number six asked:

Do you find from a preponderance of the evidence that the BMW at issue in this case was inventory of Motorcar Warehouse, Inc.?

The jury answered, "WE DO NOT."

In order for a trial court to disregard a jury's findings and grant a motion for judgment n.o.v., there must be no evidence to support the findings. *Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309 (Tex.1986).

The evidence supports the jury's finding that the transaction between Montalbano and Tips did not involve the sale of MWI's inventory. The car does not appear on the bank's list of MWI's inventory; a bank officer testified that if MWI had wished to "borrow money from the bank to purchase this car and place it in their inventory, they couldn't have...." This is sufficient evidence to support the jury's finding that the car was not MWI's inventory.

Moreover, the evidence supports the version of the facts that is implied by the jury's verdict—i.e., that the car was held for the buyer by MWI as a broker. A broker is an agent employed to make bar-

gains and contracts between other persons in matters of trade and commerce for a compensation commonly called brokerage. *Duncan v. Stevenson,* 120 S.W.2d 305, 308 (Tex.Civ.App.—Amarillo 1938, no writ).

Tips expressly told Montalbano that he did not have the specific BMW model Montalbano wanted, but would attempt to locate it for him through other channels. Jim O'Brien of Golden Imports testified that when he found the BMW, Tips asked him to deliver the vehicle to Houston and told him the car was "sold." Further, when O'Brien was asked what type of business he understood MWI to be operating, he testified, "They mainly brokered cars...." Additionally, O'Brien testified that plaintiff's exhibit four, the retail dealer's report, listed the BMW's owner as Michael J. Montalbano, not MWI. He stated that this document was significant because it shows "when the warranty started on that car." He was then asked:

[MR. ANSELL]: Would Mr. Montalbano's name be placed in this warranty book if that vehicle were being sold to a dealer or a broker for that broker to put into their inventory or keep to sell to some customer in the future sometime?

[MR. O'BRIEN]: If a broker were buying a new car from a dealer to place in his inventory to sell, he would demand that the book not have anything in it.

[MR. ANSELL]: Why is that?

[MR. O'BRIEN]: Because he would not want to be selling a new car that already has a warranty that has started on it.

Vehicle sales was a separate and distinct part of MWI's business from its vehicle locating and resale transactions, or brokerage business, that it performed for customers like Montalbano. In brokerage transactions, the automobile was not considered part of MWI's inventory, but was a "sold unit" brokered by MWI. Under these circumstances, the desired vehicle would be located at another auto business and delivered to MWI upon the seller's receipt of drafting instructions. The seller would then present its draft and be paid directly

from MBank out of MWI's account. Furthermore, MWI was not a BMW dealership and was not allowed to keep new BMWs on its showroom floor for future sale.

Kelly Sue Rowland, the assistant vice-president and operations manager of MBank's Houston Southwest office, was MBank's corporate representative at trial. She was also custodian of MBank's records. Rowland testified that the collateral pledged by MWI included "inventory, and that would be any goods that they [MWI] had for future sale at their facility." MWI's signature card, which was on file at MBank and was admitted into evidence, listed MWI as an "auto broker."

The evidence was legally and factually sufficient to support the jury's answer to special issue number six. The evidence also shows that MWI acted as a broker in this transaction, that the BMW never belonged to MWI as goods for future sale, and that it was, therefore, never part of MWI's inventory securing the loan agreement.

MBank's fourth point of error is overruled.

■ By point of error five, MBank challenges the legal and factual sufficiency of the evidence to support the jury's finding of actual damage in special issue number two. Special issue number two inquired:

What sum of money, if any, do you find from a preponderance of the evidence should be assessed against [the bank] as actual damages, if any, suffered by Golden Imports, Inc.?

You are instructed that the damages in an action for conversion are measured by the sum of money necessary to compensate a person for all actual losses or injuries sustained as a natural and proximate result of the conversion.

Answer in dollars and cents, if any.

ANSWER: $32,475.

MBank asserts that because "Golden Imports submitted this case on a conversion theory, it must prove that a portion of the money which MBank offset on December 16 actually belonged to Golden Imports." Golden Imports responds that the evidence

on actual damages is "largely uncontroverted," that its portion of the $34,953.30 sales price to Montalbano was $32,475, and that this is the amount converted by MBank when it offset MWI's account and dishonored the draft.

A jury finding of actual damages must be based on an initial finding that the bank converted money belonging to Golden Imports, and we have already found the evidence sufficient to support this finding.

MBank's fifth point of error is overruled.

MBank's sixth point of error raises several complaints. We understand it to assert, first, that the trial court erred in denying MBank's motion for directed verdict on the issues of malice and gross negligence and, second, that the trial court erred in allowing the submission of special issue number three where there was legally and factually insufficient evidence to warrant its submission.

Special issue number 3 inquired:

Do you find from a preponderance of the evidence that on the occasion in question the conversion of Golden Imports, Inc.'s property by [the bank] was accompanied by any of the following, if any:

Answer 'yes' or 'no' as to each.

(a) Malice?

(b) Gross negligence?

To both questions, the jury answered, "YES."

▆▆▆ Regarding the malice issue, if there is any conflicting evidence of probative value on any theory of recovery, the issue is for the jury, and an instructed verdict is improper. *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 263 (Tex.1983).

▆▆▆ We have already determined that there was sufficient evidence to support the finding of conversion. Golden Imports presented testimony that further indicated that MBank's conversion of funds belonging to Golden Imports was done knowingly. Malice and gross negligence may be inferred from a "knowing conversion" under-

taken under circumstances showing a lack of good faith. *First Nat'l Bank v. Brown*, 644 S.W.2d 808, 810 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

▆▆▆ Rowland of MBank testified that MBank had withdrawn $92,678.63 from MWI's account, and that the purpose of that withdrawal was to offset those funds against MWI's outstanding indebtedness to MBank. She then examined, on the stand, documents she had previously identified as the bank's payment records on MWI's notes, and which had been admitted without objection from the bank. She was unable to find any entry on those records showing that MBank had ever given MWI credit for the offset of the funds against its outstanding indebtedness to MBank. She was also unable to identify any other records that might show that credit, and she admitted that no one other than the bank would have the records showing that credit. Finally, she testified, from the bank records she did have, that the total balance MWI owed after all its credits and payments were accounted for was $58,372.21,[6] and that the $92,678.63 amount MBank had seized exceeded that indebtedness figure by more than the $32,475 amount of the dishonored draft. She did not explain why the amount MBank seized and retained exceeded MWI's indebtedness to MBank at all, let alone by such a wide margin.

The foregoing evidence, together with the evidence of conversion, raised fact questions whether, by virtue of a telephone conversation between Gonzales and Russell, MBank had known—either on December 16, when it offset the funds on deposit in MWI's account, or later, when it retained the full amount of those funds—that MWI held a portion of those funds for Golden Imports. Golden Imports thereby had successfully raised a fact issue whether MBank knowingly converted funds belonging to Golden Imports.

---

**6.** The records themselves show that the credits and payments had reduced the outstanding balance to less than $92,678.63 by April 1, 1983, and that the further reduction to $58,372.21 occurred shortly thereafter and, in any event, by the end of 1983.

At the time MBank moved for directed verdict, Golden Imports had also raised a fact issue concerning whether MBank's knowing conversion was made in good faith. Russell had not yet testified. Rowland's testimony, however, had been heard. MBank's inability to document ever giving MWI credit against MWI's indebtedness to it for the funds MBank had taken from MWI's account for that ostensible purpose, together with MWI's unexplained retention of the full amount of those funds when the amount MBank took exceeded the indebtedness figure by more than the amount of the funds Golden Imports claimed belonged to it and had been converted by MBank, tended to show a lack of good faith on MBank's part.

The question of malice was, therefore, an issue for the jury. Accordingly, we find the trial court did not err in denying the bank's motion for instructed verdict.

The question of malice was ultimately submitted to the jury in special issue number three. Point of error six also asserts that there was no evidence, or insufficient evidence, to support the jury's findings of malice and gross negligence. We disagree.

During its case in chief, MBank called both Rowland and Russell. Rowland did not testify that MWI had ever been given credit for the offset of the funds against its outstanding indebtedness to MBank or identify any records that might show such a credit. Rowland testified about the bank's security interest in MWI's inventory, proceeds, and accounts on deposit. She read the portion of the security agreement that expressly stated that "any deposit credited to the obligor is pledged to the performance of the note."

Russell first recounted the events at and following Tips' death we have set forth above. Next, he testified about the bank's security interest in MWI's inventory, proceeds, and accounts on deposit in support of MBank's position that it exercised its right as a secured creditor to seize unrestricted funds from a bank account in which it had a perfected security interest. That evidence tended to indicate good faith on MBank's part. He then said that the funds MBank seized were not immediately credited to the balance of MWI's loan, because "there was at least some possibility of charge backs" against the MWI account from which MBank had removed the funds. He testified that there were between 20 and 25 such charge backs that actually took place with respect to that account, but identified only two by dollar amount; they were for approximately $22,000 and $5,000. In reference to an entry in the bank's records for $43,923.56, he said it "could be the balance that was left from the amount that we offset in [MWI's] account less the expenses and those items that were charged back. That could be the net amount that was credited to the note." The following exchange with MBank's counsel then took place:

Q: Would there be some records somewhere that would itemize where all that was?

A: Yes.

Q: You just don't have it here today?

A: I don't have any records. Yes, there are records.

Russell later testified, on cross-examination:

Q: Did [MWI's employees] tell you about any outstanding drafts or checks that they had [during the two weeks after Tips' death]?

A: Not specifically, no.

Q: You say not specifically. They told you there were some, did they not?

A: I got a call from, I guess it was Janie, and her last name may have been Gonzales—from the lady that, as I say, I guess she is kind of an office manager. This was some time later, and she said, "The money that you have debited our account for, we have some checks out against." And I said, "I understand, but the bank has an obligation that I am gravely concerned about repayment of, and that money is an offset against that obligation."

Q: And you were not worried about anybody else who had checks or drafts or any other negotiable instruments give to them, were you?

A: I was employed by the bank.

Q: I understand that, sir.

A: And I protected the bank's interest the best I could.

Q: Anything you—the bank has security interest in, you hung on to. Isn't that correct, sir? Or that you felt the bank had a security interest in, you hung on to it. Is that not correct, sir?

A: I believe so.

From the foregoing testimony and documentary evidence, the jury could have concluded that MBank first formed the intent to lay its hands on all the assets it had the *power* to grab in order to satisfy MWI's indebtedness to it, regardless of whether that power to seize assets exceeded the scope of its *right* to seize assets pursuant to its security interest; next transferred funds into MWI's account under the guise of helpfully correcting an erroneous deposit for MWI, to increase the amount of assets available to grab; then grabbed those funds, ostensibly to offset against MWI's indebtedness; but then never followed through by giving MWI credit for that ostensible offset, and instead persistently retained funds belonging to both MWI and third parties, in excess of what was needed to protect its legitimate interests. The jury could have believed that MBank acted with a conscious indifference to the rights of Golden Imports and any other entity in a heedless, all-out effort to protect its own interests by mitigating and more-than-mitigating its losses from a bad loan, at the expense of Golden Imports. The evidence was legally and factually sufficient to support the submission of special issue number three and the jury's answer that MBank's conversion of Golden Imports' property was accompanied by malice. That answer, standing alone, is sufficient to support the jury's award of punitive damages against MBank. *See Exxon Corp. v. Allsup*, 808 S.W.2d 648, 661 (Tex.App.—Corpus Christi 1991, no writ) (in action for tortious interference with contract, finding that defendant acted with malice adequately supported award of exemplary damages, where the only negligence issue submitted to jury concerned ordinary negligence and was erroneously submitted).[7] Accordingly, we need not and do not reach the question of whether the evidence was also legally and factually sufficient to support the jury's finding on gross negligence.

MBank's sixth point of error is overruled.

MBank contends in its seventh and eighth points of error that the trial court erred in submitting special issues numbers five and eight, because there is no legal basis for the recovery of attorney's fees by Golden Imports and intervenor Montalbano, or, alternatively, that the jury's answers to those special issues were against the great weight and preponderance of the evidence.

Special issue number five inquired:

What sum of money, if any, do you find from a preponderance of the evidence to be reasonable attorney's fees and expenses incurred by Golden Imports, Inc. as a result of this suit?

Answer in dollars and cents, if any, as to each.

Special issue number eight similarly inquired in behalf of Montalbano. While the record reflects that the awards of attorney's fees were made with care and attention to the testimony given at trial, and no question exists that the jury's finding was supported by sufficient evidence, attorney's fees cannot be recovered in a tort action unless provided for by statute or by contract between the parties. *New Amsterdam Casualty Co. v. Texas Indus., Inc.*, 414 S.W.2d 914, 915 (Tex.1967). Furthermore, as a general rule, attorney's fees are not recoverable in a conversion case. *Jay Fikes & Assoc. v. Walton*, 578 S.W.2d 885, 888 (Tex.Civ.App.—Amarillo 1979, writ

---

7. *See also Marathon Oil Co. v. Sterner*, 777 S.W.2d 128, 132 (Tex.App.—Houston [14th Dist.] 1989, no writ); *Corporate Wings, Inc. v. King*, 767 S.W.2d 485, 488 (Tex.App.—Dallas 1989, no writ); *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 475–76 (Tex.App.—Houston [1st Dist.] 1985, no writ); and *Armendariz v. Mora*, 553 S.W.2d 400, 407 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.) (all: award of exemplary damages upheld on finding of malice, without any mention of negligence, ordinary or gross).

ref'd n.r.e.); Tex.Civ.Prac. & Rem.Code Ann. § 38.001 (Vernon 1986).

Golden Imports argues that *Exxon Corp. v. Bell*, 695 S.W.2d 788, 791 (Tex.App.—Texarkana 1985, no writ), establishes an exception to the general rule and allows the recovery of attorney's fees in conversion cases that are founded on a contract. The central issue in *Exxon* was whether a bill of sale for a water well included title to the pump and pipe in addition to the well shaft and casing. The court found that where the resolution of the buyer's conversion claim depended entirely on the interpretation of the contract to sell the water well, his cause of action was sufficiently grounded on contract to support the trial court's award of attorney's fees. *Id.*

Golden Imports contends that its action for conversion is founded on the oral brokerage contract between itself and MWI. However, the contract in *Exxon* was directly between the plaintiff and defendant; neither Golden Imports nor Montalbano had a contract with MBank. The resolution of Golden Imports' conversion claim depends primarily on the analysis of MBank's right of offset, not on contract interpretation. Therefore, we decline to apply the rule of *Exxon* to this case. Accordingly, there was no legal basis for the submission of either Golden Imports' or Montalbano's special issues on attorney's fees in this conversion suit.

 In any event, because MBank failed and was placed in receivership, and because there is neither a provision in the parties' contract for recovery of attorney's fees nor any collateral fund from which they can be recovered, the claim for attorney's fees must fail, because it runs afoul of the statutory requirement that the assets of a failed bank be ratably distributed among the bank's creditors holding approved or adjudicated claims. *InterFirst Bank Abilene, N.A. v. FDIC*, 777 F.2d 1092, 1097 (5th Cir.1985).

Accordingly, MBank's seventh and eighth points of error are sustained. We reverse the award requiring MBank (and the FDIC as its successor in interest) to pay Golden Imports' and Montalbano's attorney's fees.

 MBank's ninth and final point of error complains that the trial court erred in awarding prejudgment interest to Golden Imports on its attorney's fees. We found in point of error seven that Golden Imports was not entitled to attorney's fees, a necessary predicate to such interest.

MBank's ninth point of error is sustained.

### FDIC's Federal Defenses

On March 28, 1989, MBank was declared insolvent, and the FDIC was appointed receiver. In a reply brief, filed after submission and oral argument, and in its original motion for rehearing, the FDIC urges in an additional point of error that the punitive damages portion of the judgment be deleted because punitive damages cannot be awarded against the FDIC when it acts in a receivership capacity.

In its third motion for rehearing, the FDIC asserts that it is relying upon general federal common-law principles examined in five specified cases,[8] to the exclusion of either *D'Oench, Duhme* and its progeny or sovereign immunity, to contest the award of punitive damages. At oral argument on that motion for rehearing, appellant's counsel stated that appellant *is* asserting sovereign immunity with respect to the punitive damages award.

We conclude that we must consider the application of sovereign immunity on our own motion. Accordingly, we do not reach the FDIC's general federal common law argument.

 Agencies of the United States may not be held liable for punitive dam-

---

**8.** *FDIC v. Larsen*, 793 S.W.2d 37 (Tex.App.—Dallas 1990), *rev'd, Larsen v. FDIC/Manager Fund*, 835 S.W.2d 66 (Tex.1992); *FSLIC v. T.F. Stone–Liberty Land Associates*, 787 S.W.2d 475, 492 (Tex.App.—Dallas 1990, writ dism'd); *Tuxedo Beach Club Corp. v. City Federal Sav. Bank*, 749 F.Supp. 635 (D.N.J.1990); *Professional Assets Management Inc. v. Penn Square Bank, N.A.*, 566 F.Supp. 134, 136 (W.D.Okla.1983); and *FDIC v. Claycomb*, 945 F.2d 853 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992).

**648**

ages absent express Congressional authorization. *Missouri Pac. R.R. v. Ault,* 256 U.S. 554, 563, 41 S.Ct. 593, 597, 65 L.Ed. 1087 (1921). In its capacity as receiver and therefore an instrumentality of the United States, the FDIC is entitled to the protection of sovereign immunity—at least where, as here, the party opponent "fail[s] to show that an award of punitive damages against the FDIC [will] not interfere with the public administration of the assets of the receivership estate and that such an award [will] not expend itself from the public treasury by increasing the loss to the insurance fund." *Citizens Nat'l Bank of Denton v. Cockrell,* 850 S.W.2d 462, 468 (Tex.1993) (Gonzales, J., concurring).[9]

▪ Sovereign immunity is a jurisdictional prerequisite that may be asserted at any stage of the proceedings, either by the parties or by the court on its own motion. *Taylor,* 970 F.2d at 34; *Cockrell,* 850 S.W.2d at 468 (following *Taylor*) (Gonzales, J., concurring); 14 C. Wright & A. Miller, *Federal Practice and Procedure* § 3654, at pp. 186–90 (1985). A waiver of sovereign immunity may not be implied, but must be unequivocally expressed. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). Without congressional consent, a court has no jurisdiction to entertain a suit against the United States. *Id.* The government's consent to sue must be construed strictly in favor of the sovereign. *United States v. Nordic Village, Inc.,* — U.S. —, — – —, 112 S.Ct. 1011, 1014–15, 117 L.Ed.2d 181 (1992).

▪ In this case, the Bank did not post a supersedeas bond before appeal. Thus, any award for punitive damages will come from the FDIC. Because the United States government has not expressly given the plaintiff the right to sue for punitive damages in this case, it has not waived sovereign immunity as a defense. *Taylor,* 970 F.2d at 34. The award of punitive damages may not stand.

The FDIC's additional point of error is sustained.

*Summary*

We reverse that portion of the judgment below ordering MBank, and the FDIC as its successor in interest, to pay Golden Imports' and Montalbano's attorney's fees and render judgment that Golden Imports and Montalbano receive no attorney's fees or prejudgment interest thereon. We also reverse the punitive damages award against the FDIC, and render judgment that Golden Imports receive no punitive damages. In all other respects, we affirm the judgment of the trial court.

---

**9.** *See also Bank One v. Taylor,* 970 F.2d 16, 33 (5th Cir.1992); *Mendrala v. Crown Mtg. Co.,* 955 F.2d 1132, 1132 (7th Cir.1992) (the FDIC is "unquestionably" a federal agency); *City Nat'l Bank v. United States,* 907 F.2d 536, 545 (5th Cir. 1990); *Commerce Fed. Sav. Bank v. FDIC,* 872 F.2d 1240, 1248 (6th Cir.1989).