Opinion issued February 13, 2003

 














In The
Court of Appeals
For The
First District of Texas




NO. 01-02-00664-CV




BEATRYCE HALL, Appellant

V.

TEXAS DEPARTMENT OF PROTECTIVE 
AND REGULATORY SERVICES, Appellee 




On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 01-0162J




MEMORANDUM OPINION

          This is an appeal from the trial court’s decree terminating appellant Beatryce
Hall’s parental rights to her child, M.C.H. In support of the termination of parental
rights, the trial court found as follows: (1) Hall “engaged in conduct or knowingly
placed [M.C.H.] with persons who engaged in conduct which endangers the physical
or emotional well-being of [M.C.H.]”


 and (2) termination was in the best interest of
M.C.H.


 In four issues, Hall complains the trial court erred in admitting evidence of
her criminal convictions predating M.C.H.’s birth and challenges the legal and factual
sufficiency of the evidence to support the trial court’s findings.
          We affirm.
FACTUAL AND PROCEDURAL HISTORY
          Hall gave birth to M.C.H. on May 30, 1999. When she was born, M.C.H.
tested positive for cocaine; Hall tested positive for marihuana and cocaine. Hall told
a social worker at the hospital that she was using marihuana and cocaine, and that she
drank a six-pack of beer per day. She informed the social worker that she had
supported herself by being a prostitute for years and had been incarcerated four times
in the past 10 years for prostitution. Hall told the social worker that she wanted “to
make a change in her life.” 
          Hall also mentioned to the social worker that she had an eight-year-old
daughter who lived with Hall’s mother. Hall had voluntarily given custody of the
child, who was born in 1991, to her mother after the child’s birth.
          Following M.C.H.’s birth, the Texas Department of Protective and Regulatory
Services (TDPRS) provided services to Hall through the Family Base Safety Service
Plan. Hall completed the services offered through that program. Because she
continued to be monitored through another program at the Star of Hope, TDPRS
closed Hall’s case.
          TDPRS received a report of “negligent supervision,” relating to M.C.H. on
February 19, 2000. M.C.H. was burned on her forehead after Hall left her alone with
a curling iron. The following day, M.C.H. fell out of a stroller because she had not
been properly fastened into it. TDPRS deemed the incidences to be “negligent
supervision” and closed the case.
          In December 2000, Hall was convicted of marihuana possession and sentenced
to 30 days in the Harris County Jail. Although this was Hall’s first conviction
following M.C.H.’s birth, Hall had 14 criminal convictions predating M.C.H.’s birth. 
The earliest of these convictions, a September 1992 conviction for prostitution. 
Hall’s last conviction before M.C.H.’s birth was for prostitution on February 5, 1999,
approximately four months before M.C.H. was born. In total, Hall had 13 prostitution
convictions before M.C.H. was born, and one conviction for possession of cocaine
in 1997. 
          TDPRS never received a report regarding Hall’s December 2000 conviction for
marihuana possession. The next referral received by TDPRS was on February 20,
2001. Hall was convicted of possession of cocaine and sentenced to nine months
confinement. TDPRS discovered that the person caring for M.C.H. was a non-relative with no “legal papers” for the child. 
          TDPRS then contacted M.C.H.’s grandmother. The grandmother stated that
she could not take M.C.H. and explained that no other relative would care for M.C.H.
because she was “biracial.” At that time, TDPRS took custody of M.C.H. M.C.H.
appeared to be well-cared for and had no special needs.
          TDPRS presented Hall with a Family Plan of Service in October 2001, while
she was still incarcerated. The plan of service required Hall to attend parenting
classes, cooperate with TDPRS, and stop all criminal activity after her release. 
During her incarcertion, Hall completed parenting classes and several other programs
offered through the prison system including a drug treatment program. 
          When she was released in November 2001, Hall contacted TDPRS. The
agency requested Hall to complete a substance abuse assessment, drug program, and
additional parenting classes. TDPRS made referrals for the drug assessment and
parenting class. Despite the referrals, Hall never went for the drug assessment or
attended the parenting classes. 
          Hall found employment and housing soon after her release from jail. She also
attended a drug therapy program once a week; however, after she became employed,
Hall sometimes missed the weekly meetings.
          After her November 2001 release, Hall began weekly visits with M.C.H. But,
in January 2002, Hall missed a visit and then in the weeks that followed, she missed
two more.
          Hall was again arrested for prostitution on February 12, 2002 and sentenced to
six months incarceration. Hall’s release date was August 9, 2002. 
          TDPRS sought to have Hall’s parental rights terminated. The final hearing on
the termination was tried to the bench on May 23, 2002. At the hearing, Hall testified
that she did not attend parenting classes after her November 2001 release from jail
because TDPRS had never requested her to attend the classes. Such testimony was
contrary to evidence introduced by TDPRS that Hall was told that she was required
to attend the classes. Hall admitted to missing her appointment for a drug assessment;
she stated that she was incarcerated before she could make another appointment.
          Toward the end of the termination hearing, Hall explained that, in the past, her
prostitution “went hand in hand” with her drug addiction. However, she testified that,
at the time of her February 12, 2002 arrest, she had been clean and sober for one year. 
          Hall testified that she was not allowed to further her education while in jail
because the correctional facility considered her to be “too educated.” At some point,
Hall had attended Rice Aviation to obtain a license in aviation maintenance. 
According to Hall, she had eight months left in the program to obtain her aviation
mechanics license. Hall stated the course was free because she is an honorably-discharged veteran. 
          At the time of the hearing, Hall was 78 days from being released from prison.
With regard to her future plans, Hall stated that she would change her life and work
on staying sober so that she could get M.C.H. back. Hall testified that she had been
accepted into Sally’s House Program, a transitional living center for women that
provides sobriety counseling services and assists single women to find jobs and
housing. According to Hall, Sally’s House Program would not allow her to have
M.C.H. with her, but Hall planned to use the program to obtain a referral to a family-based program. Hall estimated that she would be in a position to take care of M.C.H.
by the time M.C.H. was three-and-one-half or four years old. 
          When asked whether there was anything that she would like the trial court to
know about her future plans, Hall stated, 
Basically, my plans are to get my life together. Every [sic] since my
little girl was born, I’ve struggled to change from my past life. When
my little girl was born, I intended to change my life and that’s been my
struggle and to be clean and to live a normal life, you know. My plans
are: To continue working on my recovery, to continue getting my
education, to take my parenting classes. I mean to do anything
necessary to become the best mother I can be for my daughter.
          Frederick Jones, a TDPRS caseworker also testified at the termination hearing. 
Jones stated he had told Hall she was required to attend parenting classes after her
release from jail in November 2001. Jones made a referral, but Hall never attended
the classes. 
          Jones observed Hall during her visits with M.C.H. following her release from
jail in November 2001. He stated that they two appeared to be bonding and that Hall
behaved appropriately with M.C.H. during the visits. 
          Jones testified that he had contacted M.C.H.’s grandmother to determine
whether she could care for M.C.H. Because of the her health, the grandmother told
Jones she could not take M.C.H. Jones also requested a home study be completed on
M.C.H.’s grandfather. At the time of the hearing, Jones stated that he had not
received the results of the home study. 
          Jones also testified that TDPRS’s long-term plan for M.C.H. was adoption. He
stated that M.C.H. was in a foster home that was meeting her medical, physical, and
emotional needs. Jones testified that the foster parents caring for M.C.H. wished to
adopt her. Jones explained that termination of Hall’s parental rights, and then
adoption, were best for M.C.H. because of her age and her need for immediate
placement. At the time of the termination hearing, M.C.H. was one week shy of her
third birthday. Jones further explained that termination of parental rights was in
M.C.H.’s best interest because (1) Hall had a history of substance abuse,(2) Hall was
currently “in prison for the second time,”


 and (3) there was no current placement for
M.C.H. Jones stated that TDPRS did not want to give Hall a “second chance”
because (1) Hall’s case had “been extended already,” (2) TDPRS had offered Hall
services in the past and she had failed to complete them, and (3) Hall had “picked up”
another conviction resulting in her incarceration.
          The record also reveals the following exchange between the attorney
representing M.C.H. and Hall:
 
[M.C.H.’s attorney]: . . . I represent the child and obviously I’m
concerned about the baby’s best interest. Now, you’ve written me
numerous letters talking about how you want to provide a safe and
stable home for [M.C.H.]. My concern is after this evidence that’s been
put in before the Court today, it’s replete, you know, with doubt in mind
[sic] as to whether or not you would be best to have [M.C.H.] in your
home. I’m trying to understand. What can you tell us to convince us
today that you’re not going to get into anymore trouble like you did last
year?
 
[Hall]: Basically, when I got out last year, I didn’t get the proper support
system; and I did not get into the proper—enough services to help me
like I should. I was accepted in Sally’s House last year. I should have
gone to Sally’s House instead of getting out and trying to do all these
things on my own without the proper support services. I would not of
got into the financially [sic] problems that caused me to get out there
and prostitute.
 
Basically, I love my little girl and I’m willing to do whatever I
have to do. If that means changing everything about my life, places,
things, friends, location, everything; I’m willing to do anything.
          After hearing all of the evidence, the trial court entered a decree terminating
Hall’s parental rights. The decree also terminated the rights of M.C.H.’s father, the
identity of whom is unknown.


 With regard to the termination of Hall’s parental
rights, the decree provides, in relevant part, as follows:
The Court finds by clear and convincing evidence that termination of the
parent-child relationship between Beatryce Hall, and the child [M.C.H.] 
is in the best interest of the child and further that the mother:
 
engaged in conduct or knowingly placed the children [sic]
with persons who engaged in conduct which endangers the
physical or emotional well-being of the children [sic].

This appeal followed. 
DISCUSSION
A.      Evidentiary Issue
          In issue one, Hall complains of the trial court’s ruling to admit TDPRS exhibits
numbered two through 16, documents that evidence Hall’s 14 criminal convictions
predating M.C.H.’s birth. 
          When TDPRS offered exhibits two through 14 into evidence, Hall’s attorney
objected to the relevancy of the exhibits on the basis that they all predated the birth
of M.C.H. This was the only objection offered by Hall as to these exhibits. TDPRS
responded that the exhibits were relevant because they showed “an ongoing pattern
of conduct of lifestyle, which is involving both drugs and prostitution. We . . . have
no other evidence to indicate that . . . while out of jail she’s had any other kind of
lifestyle.” The trial court overruled the relevancy objection stating, “Seems to me that
this certainly is very—a continuing course of conduct of the mother, how she’s
conducted herself.”
          On appeal, Hall complains TDPRS’s exhibits two through 16 should not have
been allowed because they fail to conform with Rules of Evidence 404, 607, 608, or
609. As noted by TDPRS, these evidentiary rules were never raised by Hall to
support her inadmissibility argument, or otherwise implicated in the trial court. At
trial, Hall made only one objection to these exhibits: relevancy. The basis for Hall’s
complaint on appeal does not match the objection she made at trial. An objection on
appeal that does not comport with the objection raised at trial presents nothing for
review. Tex. R. App. P. 33.1; F.D.I.C. v. Golden Imports, Inc., 859 S.W.2d 635, 641
(Tex. App.—Houston [1st Dist.] 1993, no writ). Even assuming Hall’s complaint was
preserved, this Court, and our sister courts, have stated that evidence of criminal
conduct predating the child’s birth is relevant in parental-termination cases. Avery
v. State, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ); In re
D.T., 34 S.W.3d 625, 637 (Tex. App.—Fort Worth 2000, pet. denied); In re M.J.M.L.,
31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied); see also Robinson
v. Tex. Dept. of Protective and Regulatory Servs., 89 S.W.3d 679, 688 (Tex.
App.—Houston [1st Dist.] 2002, no pet.).
          We overrule Hall’s issue one.
B.      Sufficiency of the Evidence
          In issues two and three, Hall complains that the evidence was legally and
factually insufficient to support the trial court’s finding that Hall engaged in conduct
that endangered M.C.H. Hall contends in her fourth issue that the evidence was
factually and legally insufficient to support the trial court’s finding that termination
of her parental rights was in M.C.H.’s best interest.
 
          1.       Burden of Proof and Standard of Review
          A parent’s rights to “the companionship, care, custody and management” of his
or her children are constitutional interests “far more precious than any property right.”
Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982). In a
termination case, the State seeks not just to limit those rights, but to end them
permanently—to divest the parent and child of all legal rights, privileges, duties, and
powers normally existing between them, except for the child’s right to inherit. Tex.
Fam. Code Ann. § 161.206(b) (Vernon 2002); Holick v. Smith, 685 S.W.2d 18, 20
(Tex. 1985).
          Evidence supporting the findings to terminate parental rights must be clear and
convincing, not just preponderate. In re G.M., 596 S.W.2d 846, 847 (Tex. 1980);
Harris v. Herbers, 838 S.W.2d 938, 941 (Tex. App.—Houston [1st Dist.] 1992, no
writ). The clear and convincing standard of proof at trial is intentionally placed on
the party seeking the termination of the parental rights, so as to create a higher burden
to fulfill, due to the severity and permanence of the termination of the parent-child
relationship. Robinson, 89 S.W.3d at 685; Harris v. Herbers, 838 S.W.2d 938, 941
(Tex. App.—Houston [1st Dist.] 1992, no writ). The clear and convincing standard
is the degree of proof that will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be proved. Robinson, 89
S.W.3d at 685; Harris v, 838 S.W.2d at 941.
          The Texas Supreme Court recently stated, “The distinction between legal and
factual sufficiency when the burden of proof is clear and convincing evidence may
be a fine one in some cases, but there is a distinction in how the evidence is
reviewed.” In re J.F.C., 46 Tex. Sup. Ct. J. 328, 333 (Dec. 31, 2002). In a legal
sufficiency review, we look at all the evidence in the light most favorable to the
finding to determine whether a reasonable trier of fact could have formed a firm belief
or conviction that its finding was true. Id. To give appropriate deference to the
factfinder’s conclusions and the role of a court conducting a legal sufficiency review,
looking at the evidence in the light most favorable to the judgment means that we
must assume that the factfinder resolved disputed facts in favor of its finding if a
reasonable factfinder could do so. Id. We should disregard all evidence that a
reasonable factfinder could have disbelieved or found to have been incredible. Id. at
334. This does not mean that we must disregard all evidence that does not support
the finding. Id. Disregarding undisputed facts that do not support the finding could
skew the analysis of whether there is clear and convincing evidence. Id. 
          Likewise, in determining a factual sufficiency point, the higher burden of proof
in termination cases alters the appellate standard of review. In re C.H., 89 S.W.3d 17,
26 (Tex. 2002). “[A] finding that must be based on clear and convincing evidence
cannot be viewed on appeal the same as one that may be sustained on a mere
preponderance.” Id. at 25. In considering whether evidence rises to the level of being
clear and convincing, we must consider whether the evidence is sufficient to produce
in the mind of the fact finder a firm belief or conviction as to the truth of the
allegation sought to be established. Id. Our inquiry here is whether, on the entire
record, a fact finder could reasonably form a firm conviction or belief that the parent
endangered the child and that the termination of the parent’s parental rights would be
in the best interest of the child. Id. at 29.
          2.       Endangerment Through Course of Conduct: Family Code
Subsection 161.001(1)(E)
          Section 161.001 of the Texas Family Code provides the method by which a
court may involuntarily terminate the parent-child relationship. Tex. Fam. Code.
Ann. art. 161.001 (Vernon Supp. 2003). Under this section, a court may order the
termination of the parent-child relationship if the court finds, by clear and convincing
evidence, that (1) one or more of the acts enumerated in subsection 161.001(1) was
committed; and (2) termination is in the best interest of the child. Tex. Fam. Code.
Ann. § 161.001(1); see Robinson, 89 S.W.3d at 686; In re B.M.R., 84 S.W.3d 814,
817 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Here, the trial court found, by
clear and convincing evidence, that termination was in M.C.H.’s best interest and that
Hall had engaged in conduct specified in section 161.001(1).
          In issues two and three, Hall challenges the legal and factual sufficiency of the
evidence to support the trial court’s finding that she “engaged in conduct or
knowingly placed [M.C.H.] with persons who engaged in conduct which
endanger[ed] the physical or emotional well-being of [M.C.H.].” This finding tracks
the language of subsection 161.001(1)(E). 
          Within the context of subsection 161.001(1)(E), “endanger” means to expose
a child to loss or injury or to jeopardize a child’s emotional or physical health. Tex.
Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); Tex. Dep’t of
Protective & Regulatory Servs. v. Doyle, 16 S.W.3d 390, 394 (Tex. App.—El Paso
2000, pet. denied). While “endanger” means more than a “threat of metaphysical
injury or the ill effects of a dysfunctional family,” it does not require that the conduct
be actually directed at a child or that a child suffer an actual injury. Boyd, 727
S.W.2d at 533. 
          Under subsection 161.001(1)(E), the danger to a child must arise solely by the
parent’s conduct established by the parent’s actions or by the parent’s failure to act. 
Robinson, 89 S.W.3d at 686; Doyle, 16 S.W.3d at 394. Mere imprisonment will not,
standing alone, constitute engaging in conduct that endangers the physical or
emotional well-being of the child. Boyd, 727 S.W.2d at 533; Robinson, 89 S.W.3d
at 686; Harris, 838 S.W.2d at 942. However, if all the evidence, including
imprisonment, shows a course of conduct that has the effect of endangering the
physical or emotional well-being of the child, a finding under section 161.001(1)(E)
is supportable. Robinson, 89 S.W.3d at 686; see also Boyd, 727 S.W.2d at 533-34;
Harris, 838 S.W.2d at 942. The conduct need not be directed toward the child or
cause the child physical injury to constitute conduct that endangers the emotional
well-being of the child. Robinson, 89 S.W.3d at 686; Allred v. Harris County Child
Welfare Unit, 615 S.W.2d 803, 806 (Tex. Civ. App.—Houston [1st Dist.] 1980, no
writ).
          The evidence showed that Hall committed the crime of prostitution in February
2002, even though she was aware that her parental rights were in jeopardy. In
Robinson, we recently held such evidence to be sufficient to support a finding of
endangerment under section 161.001(1)(E). See 89 S.W.3d at 687 (holding evidence
of continued drug use when mother knew her parental rights were in jeopardy to be
factually sufficient to support termination under subsection 161.001(1)(E)); see also
In re J.N.R., 982 S.W.2d 137, 142 (Tex. App.—Houston [1st Dist.] 1998, no pet.)
(holding evidence of father’s continued criminal activity sufficient to support
termination of parental rights when father aware parental rights were in jeopardy). 
In addition, Hall’s most recent arrest was not an isolated incident; it was her third
arrest since M.C.H.’s birth. And it was her seventeenth arrest in the last 10 years. 
Criminal activity occurring both before and after the child’s birth is relevant in
determining the issue of endangerment under subsection 161.001(1)(E). Avery, 963
S.W.2d at 553; In re S.F., 32 S.W.3d 318, 322 (Tex. App.—San Antonio 2000, no
pet.). 
          Evidence was also presented that Hall failed to complete additional parenting
classes and submit to a drug assessment after her November 2001 release from jail,
as required by the TDPRS plan of service. While the evidence is conflicting as to
whether TDPRS told Hall that she needed to complete additional parenting classes,
the trial judge, as the trier of fact, could have chosen to believe Jones’s testimony that
he had informed Hall of the requirement. 
          The record also reveals that M.C.H. was born with cocaine in her system, and
that Hall continued to use drugs after M.C.H.’s birth, as evidenced by Hall’s
December 2000 conviction for marihuana possession and February 2001 conviction
for cocaine possession. Evidence was presented that Hall has made efforts to
overcome her drug addition and improve her life. Hall found a job and housing
quickly after her last release, and, was, in fact, working two jobs. Hall’s uncontested
testimony was that she has been clean and sober for one year and completed a drug
treatment program while incarcerated. Hall also continued to attend weekly drug
therapy sessions after her November 2001 release, although she did occasionally miss
a session due to her employment. Evidence was also introduced showing that Hall
had completed numerous programs and classes since M.C.H.’s birth in 1999,
including many parenting-related classes. During her most recent incarceration, Hall
has been accepted into a program that she plans to use as a stepping-stone to a family-based program. Hall, an honorably-discharge veteran, also plans to complete her
education. However, the evidence that is favorable to Hall must be viewed in the
context of the entire record and not in isolation.
          Despite the positive strides that she has made to improve her life, the fact
remains that Hall made the choice to commit the crime of prostitution at a time when
she knew that she was at risk of losing her parental rights. Hall’s testimony regarding
her February 2002 arrest is particularly telling. She testified as follows:
I did stop using drugs and I did have a financial situation. I was trying
to get ahead to get [M.C.H.] home. I did resort to turning a few tricks
to try to get the money to get the things so I could get my baby home
faster. And that’s what happened. I got caught.
(Emphasis added.) Hall’s testimony on this point shows no remorse for her conduct
or any acknowledgment that it was wrong. Rather, the testimony indicates that Hall
viewed prostitution as a legitimate means to earn additional income. Hall’s only
regret appears to be that she “got caught.” The record also reveals that Hall told the
social worker at the hospital at the time of M.C.H.’s birth that she wished to make a
positive change in her life. Hall has made efforts to improve her life since the time
of M.C.H.’s birth; however, at the same time, Hall continued to engage in criminal
activity, as she had for many years before M.C.H.’s birth. Based on the evidence
presented, the trial judge could have reasonably inferred that Hall has pursued a
course of conduct, and will continue to pursue a course of conduct, that has
endangered the physical health and well-being of M.C.H.
          Applying the appropriate standards of review, we hold that the evidence was
legally and factually sufficient for the trial court to have reasonably formed a firm
belief that appellant engaged in conduct that endangered M.C.H.’s well-being.
          We overrule Hall’s issues two and three.
          2.       Best Interest of M.C.H.
          In issue four, Hall challenges the legal and factual sufficiency of the evidence 
to support the trial court’s finding that termination would be in M.C.H.’s best interest. 
See Tex. Fam. Code Ann. § 161.002 (Vernon Supp. 2003). Some of the factors an
appellate court may consider in ascertaining the best interest of a child include the
non-exhaustive list set forth in Holley v. Adams. 544 S.W.2d 367, 371-72 (Tex.
1976). Those factors include the following: (1) the desires of the child; (2) the
emotional and physical needs of the child now and in the future; (3) the emotional
and physical danger to the child now and in the future; (4) the parental abilities of the
individuals seeking custody; (5) the programs available to assist these individuals to
promote the best interest of the child; (6) the plans for the child by these individuals
or by the agency seeking custody; (7) the stability of the home or proposed
placement; (8) the acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and (9) any excuse for the acts or
omissions of the parent. Id. at 371-72. 
          These factors are not exhaustive. In re C.H., 89 S.W.3d at 27. The absence of
evidence about some of these factors does not preclude a factfinder from reasonably
forming a strong conviction or belief that termination is in the child’s best interest. 
Id. “Best interest” does not require proof of any unique set of factors, nor does it
limit proof to any specific factors. Holley, 544 S.W.2d at 371-72. Evidence that is
probative of acts or omissions under subsection 161.001(1) may also be probative in
determining whether termination is in the best interest of the child. In re C.H., 89
S.W.3d at 28; In re D.M., 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no
pet.). With the foregoing legal precepts in mind, we review the sufficiency of the
evidence to support the trial court’s finding that termination was in M.C.H’s best
interest. 
          TDPRS relies primarily on Hall’s history of incarcerations, criminal conduct,
and substance abuse to support the trial court’s best interest finding. While Hall’s
past drug abuse, including during her pregnancy with M.C.H., and her apparent
inability to live a life free of arrests and incarcerations, even when faced with losing
her child, supports the trial court’s endangerment finding, this evidence also supports
the best interest determination. See In re C.H., 89 S.W.3d at 28; see also Robinson,
89 S.W.3d at 688 (considering evidence of pattern and practice of drug abuse over
20 years to be evidence that supported best interest finding). 
          Relating to the agency’s plans for M.C.H., TDPRS presented evidence that
M.C.H. is thriving and doing well in her current foster care, and that her current foster
parents wish to adopt her. The agency believes that termination and adoption are in
M.C.H.’s best interest because of her age and her need for immediate placement. In
contrast, Hall argues that TDPRS failed to show termination and adoption were in
M.C.H.’s best interest. Hall contends that placement of M.C.H. with the child’s
grandfather is a viable option. Hall’s contention is based on Jones’s testimony that
a home-study on the grandfather was not yet completed at the time of the hearing. No
other evidence was presented relating to possible placement with the grandfather. 
However, another TDPRS social worker testified that M.C.H.’s grandmother told her
that no one in the family would take M.C.H. because she was biracial. 
          Regarding the provision of a suitable home, Hall presented evidence that she
had arranged to participate in a program through Sally’s House after her release in 78
days. She stated this would enable her to gain acceptance into a family-based
program. Hall believed that she would complete the program through Sally’s House
within 30 days and would be in a position to care for M.C.H. within six months to one
year. However, Hall revealed that she had been accepted into Sally’s House Program
prior to her last release from jail but had failed to follow-through with the program. 
          Other evidence relevant to the Holley factors include the following: (1) M.C.H.
has no special physical or emotional needs; (2) M.C.H. was in good condition when
TDPRS took custody of her in March 2001; (3) Hall had left M.C.H. with a non-relative who had a criminal and TDPRS history; (4) Hall missed scheduled visits with
M.C.H. after her November 2001 release from jail; (5) Hall acted appropriately during
the visits she did have with M.C.H., and the two appeared to bond; (6) Hall failed to
take parenting classes following her last release or submit to a drug assessment; (7)
Hall had been drug-free for one year; (8) Hall had participated in a drug therapy
program during incarceration; (9) although numerous programs are available to assist
Hall, and she has completed many in the past, the programs have apparently had little
effect as evidence by Hall’s continued criminal activities; and (10) Hall has
previously expressed a desire to change her life in the past but has failed to do so.
          Undeniably, some evidence exists in the record that weighs in favor of Hall
under the Holley factors. The record also contains evidence that shows Hall has taken
steps both in the past and during her most recent incarceration to improve her life and
be a good parent. However, as mentioned under the discussion of the endangerment
issue, evidence cannot be read in isolation; it must be read in the context of the entire
record. The record reveals that, in the past, when Hall has taken one step forward,
she ultimately takes two back by committing another criminal act. As the factfinder,
the trial judge could have reasonably inferred that Hall would continue her pattern
and practice of illegal conduct once she is released from jail. Such an inference
relates directly to Hall’s ability to provide a stable and suitable home for M.C.H. and 
indicates that M.C.H.’s emotional well-being may be endangered in the future. 
          We conclude that the evidence was sufficient to allow the trial court to form
a firm belief that termination was in the best interest of M.C.H. Accordingly, we hold
that the evidence is legally and factually sufficient to support the trial court’s finding
that termination was in M.C.H.’s best interest.
          We overrule Hall’s issue four.

CONCLUSION
          We affirm the trial court’s judgment.
                                                             

 
                                                             Laura C. Higley 
                                                             Justice
 
Panel consists of Justices Taft, Keyes, and Higley.